WILLIAM BURRGESS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Windy City Building Service, Appellee).

First District (Industrial Commission Division)   No. 1—87—0762WC

Opinion filed April 27, 1988.

James J. Marszalek, of Chicago, for appellant.

Poulakidas & Wood, of Chicago, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Claimant appeals from an order of the circuit court which confirmed a finding by the Industrial Commission (Commission) that claimant's temporary disability ended in March 1983. On appeal, claimant maintains he established he is entitled to additional benefits because of his continuing disability. Claimant argues he is also entitled to an award of additional medical expenses. Finally, respondent argues claimant is entitled to a smaller award of benefits and medical expenses because the record establishes claimant's temporary disability ended prior to the date fixed by the Commission.

On August 20, 1981, claimant, a carpenter, injured his lower back while working for respondent. Claimant notified his employer of the accident and three days later began acupuncture treatments with Dr. Sunderlage, who administered 21 such treatments and released claimant to return to work on November 19, 1981. In February 1982 claimant saw Dr. Fisk because of continuing lower back pain. Fisk treated claimant with therapy for four weeks between February and March 1982.

In May 1982, claimant saw Dr. Imana, a neurosurgeon, who conducted nerve tests. Imana sent claimant to Dr. Yuhas for further tests. After a CAT scan and myelogram, Imana performed a laminec-

tomy on the L5-S1 disc on June 18, 1982, and subsequently released claimant to return to work on August 17, 1982.

Claimant was unable to return to respondent's employ, however, because it had gone out of business. In September 1982 claimant accepted light carpentry work from a contractor. This employment lasted six to eight weeks before claimant quit because his back continued to hurt.

Claimant returned to Dr. Imana, who performed a myelogram and prescribed rehabilitation pain center treatment which claimant declined because prior therapy and manipulation of his back did not aid his condition. In December 1982 claimant went to Dr. Brackett, an orthopedist, who performed manipulative therapy on two occasions. Claimant discontinued these sessions because he felt worse after treatment than before. Claimant also visited Dr. Fox on February 8, 1983, for further tests.

Thereafter claimant sought treatment from Dr. Yarzagaray, a neurosurgeon, on March 15, 1983. Yarzagaray sent him to Dr. Sullivan, who performed EMG and nerve conduction tests. Claimant was also treated by Dr. Biller from May 1983 through November 1983. Biller referred claimant to Dr. Blair, who prescribed a TENS unit which provided mild electric shock to claimant's back. Claimant wore the TENS unit constantly until May 1984.

Claimant returned to work in February 1984 running a machine for a manufacturer who produced plastic television parts. This employment lasted 34 days before claimant quit, complaining of exhaustion and constant pain. In May 1984 claimant attempted to work as a garage door opener installer. He quit after the second day, stating he was not able to lift the 15-pound weight. In August 1984 claimant went to work for Data Company for an unspecified period performing unspecified labor.

In May 1984 claimant went to Dr. McNeill, an orthopedic surgeon, who, in September 1984, suggested claimant began wearing a TLSO back brace and suggested fusion surgery to supplement the previous laminectomy. Claimant testified he did not permit fusion surgery because he could not afford it. A CAT scan was performed in August 1985 by McNeill, who again suggested this procedure.

At the arbitration hearing, claimant testified he continues to suffer numbness and pain in his legs and back. The brace restricts his movement but relieves his pain. Claimant stated he can work while wearing the brace, but no one will hire him because of his condition.

On cross-examination, claimant admitted he had chosen all of the treating physicians with whom he visited. He acknowledged Dr. Im-

ana indicated to him, after the myelogram in the fall of 1982, Imana could find nothing objectively wrong with him. He also admitted he told Imana on August 31, 1982, he had no pain in his back or legs. He also acknowledged Drs. Fox, Brackett, and Fisk told him between February and March 1983 they could find nothing which objectively supported the symptoms of which claimant complained. According to claimant, Dr. Fisk went so far as to call him a phony and insurance fraud.

All medical evidence was submitted by way of reports or correspondence. In chronologic fashion these records reveal the following. Dr. Sunderlage released claimant to return to full duties on November 19, 1981. On February 10, 1982, Dr. Fisk found claimant suffered from mild degenerative joint disease. He diagnosed lumbosacral strain. His diagnosis was based on an X ray showing a normal lumbar spine. On March 30, 1982, Fisk's notes indicate there were no objective symptoms to support claimant's complaint of continuing low back pain. Fisk recommended claimant return to work immediately and terminate his temporary total disability. A further report from Dr. Dwyer, who examined claimant, apparently at the request of respondent's insurance carrier, in April 1982, found no objective evidence of any disability in claimant's lower back or lower extremities. Notes made by Dr. Fisk on April 16, 1982, indicate claimant was showing "extreme denial of emotional problems."

During this period claimant was also suffering from unrelated disabilities. He was experiencing some difficulty with his arms, wrists, and upper cervical back. Abnormalities in claimant's C6-C7 cervical disc were noted as well as evidence of mild carpal tunnel syndrome. These conditions were unrelated to the industrial accident. In addition, claimant suffered from testicular pain and sexual dysfunction. During several months in 1982, increased swelling of the lymph nodes in the groin was noted. A urologist was consulted and after some months of therapy this problem was corrected. Several of claimant's doctors were of the opinion some of the pain in claimant's legs and thighs was due to this pelvic condition, which was also unrelated to claimant's lower back problem.

On May 13, 1982, Dr. Imana diagnosed L5-S1 root irritation and early signs of carpal tunnel syndrome. Imana removed the disc on June 18, 1982. Claimant saw a rehabilitation nurse on July 26, 1982, who indicated claimant's motivation for returning to work was difficult to assess because claimant was becoming antagonistic toward respondent over the continuing dispute about payment of benefits. Notes form Dr. Yuhas on August 26, 1982, after the myelogram indi-

cate claimant's neurologic exam was normal although urologic problems and impotence were still present.

On August 31, 1982, Dr. Imana recorded in his notes the fact claimant stated he had no pain in his lower back or legs and was ready to go to work. On November 11, 1982, Dr. Paul conducted an EMG test which he found normal. Paul recommended claimant visit a pain treatment center for his continuing subjective complaints.

On February 8, 1983, Dr. Ludwig, who examined claimant at the request of claimant's attorney, found claimant reacted positively for root irritation. In contrast, an examination of February 15, 1983, by Dr. Fox found no radiculopathy present. A March 3, 1983, examination by Dr. Brackett also found no evidence of any objective condition to support the subjective complaints of pain. Brackett released claimant to return to full employment duties as of March 7, 1983.

Subsequent examination by Dr. Sullivan on April 30, 1983, showed evidence of cervical radiculopathy and borderline carpal tunnel syndrome. A March 1984 CAT scan showed mild degenerative disease in several aspects of the spinal column. On May 1, 1984, Dr. McNeill found claimant's condition stable and surgery was inappropriate at that time. McNeill prescribed the use of a TENS unit. McNeill diagnosed degenerative conditions at the C5-C6 and C6-C7 vertebrae. McNeill found no change in claimant's condition following a September 1984 examination. McNeill prescribed either continuing use of the TENS unit or reconstructive surgery for the "failed" laminectomy. A January 1985 examination by Dr. Hischfield, conducted at the request of claimant's attorney, recommended additional back treatment. On May 3, 1985, Dr. McNeill again suggested fusion of the L5-S1 disc but found claimant was afforded relief from pain when he wore the back brace.

The arbitrator awarded temporary total disability benefits in the amount of $374.33 for 46 weeks, covering the period between the date of the accident and March 7, 1983, when claimant was released by Dr. Brackett to return to work. The arbitrator also credited respondent with a portion of medical payments advanced because claimant did not first seek respondent's consent for treatment from the numerous doctors he visited. Finally, the arbitrator found claimant failed to prove he was still under treatment and unable to work, relying upon the evidence provided by those doctors who found no objective symptoms to support claimant's subjective complaints of pain. Both parties petitioned for review before the Commission. The Commission affirmed the arbitrator and both parties sought review before the circuit court. The trial court affirmed the Commission decision as to the

finding of temporary total disability. It reversed the Commission as to that portion of its order which denied certain medical expenses claimant incurred prior to March 7, 1983, reasoning claimant was entitled to all necessary medical expenses for the entire period he was determined to be temporarily totally disabled. Claimant filed a timely notice of appeal.

■ The initial question is whether the Commission's determination claimant's disability ended in March 1983 is against the manifest weight of the evidence. The issue is strictly one of credibility. The resolution of factual matters regarding the extent of an employee's injury is for the Industrial Commission to determine. Where, as here, medical evidence is in dispute and there is evidence in the record which would sustain the finding of the Industrial Commission, its finding will not be disturbed unless it is contrary to the manifest weight of the evidence. (*Spector Freight System, Inc. v. Industrial Comm'n* (1983), 93 Ill. 2d 507, 514, 445 N.E.2d 280, 283.) According to the medical evidence presented, claimant was released to return to full employment as of March 7, 1983, following his laminectomy. At least six of claimant's treating physicians found no objective support for claimant's subjective complaints of lower back pain at that time. Although claimant had continuing problems traceable to carpal tunnel syndrome, a degenerative condition of the cervical spine, and urologic problems, these were unrelated to the incident for which benefits were sought. Dr. McNeill diagnosed evidence of continuing root irritation which, he believed, could be addressed by fusing the disc at L5-S1.

■ Temporary total disability is to be awarded for the period of time between the injury and the date the employee's condition has stabilized. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 35, 44, 454 N.E.2d 252, 257.) Stated in other terms, temporary total disability exists from the time an injury incapacitates an employee for work until such time as he is as far restored as the permanent character of his injury will permit. (*Shell Oil Co. v. Industrial Comm'n* (1954), 2 Ill. 2d 590, 119 N.E.2d 224.) One is temporarily totally disabled when he cannot perform any services except those for which no reasonably stable labor market exists. (*Zenith Co. v. Industrial Comm'n* (1982), 91 Ill. 2d 278, 437 N.E.2d 628.) In proving such period of incapacity, it is not enough for the employee to show he did not work—he must also show that he was unable to work. *Arbuckle v. Industrial Comm'n* (1965), 32 Ill. 2d 581, 207 N.E.2d 456.

■ ■ In addition to the conflicting medical evidence which the Commission resolved against claimant, there was testimony claimant

actually returned to work and was able to work when wearing his back brace. Finally, although Dr. McNeill suggested fusion surgery, McNeill did not indicate such a procedure would materially improve claimant's present condition. The Industrial Commission is not required to find for a compensation claimant merely because there is some testimony which, if it stood alone and undisputed, might warrant such a finding. (*Bernard v. Industrial Comm'n* (1962), 25 Ill. 2d 254, 184 N.E.2d 864.) It is the province of the Commission to draw reasonable inferences from both direct and circumstantial evidence and the court will not disregard those permissible inferences merely because others might have been drawn. (*County of Cook v. Industrial Comm'n* (1977), 69 Ill. 2d 10, 370 N.E.2d 520.) Since there is evidence supporting the finding of the Industrial Commission that claimant's temporary disability had stabilized as of March 7, 1983, its decision is not against the manifest weight of the evidence.

■ Claimant also argues he was denied due process and equal protection by the requirement of section 8(a) of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(a)) that he seek the consent of the employer in selecting a physician after having exhausted his first two elective choices. The statute provides the employer's liability to pay medical benefits is limited to those incurred as a result of an employee's selection of two health service providers and anyone in their chain of referral. The statute then states:

> "Thereafter the employer shall select and pay for all necessary medical, surgical and hospital treatment and the employee may not select a provider of medical services at the employer's expense unless the employer agrees to such selection. At any time the employee may obtain any medical treatment he desires at his own expense." Ill. Rev. Stat. 1985, ch. 48, par. 138.8(a)(3).

Claimant maintains his constitutionally protected right to pursue his preinjury occupation as a carpenter or any other occupation has been denied him by application of this statute because he has been unable to afford medical treatment since March 1983, which he believes could return him to a condition which would permit him to seek gainful employment. By providing the employer must consent to treatment, claimant argues the employer is allowed unlimited control over the employee's medical treatment. This argument is without merit. Claimant cites Professor Larson for the proposition he ought to be given the benefit of the doubt when it is determined he has acted in good faith in selecting health providers. (See 2 A. Larson, Workmen's Compensation Law §61.12 (1987).) However, that treatise also recog-

nizes there are legitimate reasons for limiting employees' choices. It reduces "doctor shopping" and ensures maximum rehabilitation by exercising control over the nature and quality of the medical services available. Claimant has not established the statute, on its face, denies him due process or equal protection.

Moreover, claimant has failed to prove the statute, as applied in this case, denied any protected constitutional rights. There is no evidence claimant ever sought permission from the employer for treatment by physicians in addition to the two he originally selected or that the respondent unreasonably refused to permit necessary medical treatment even though claimant had exhausted his statutory choices. Having failed to allege or prove he attempted to seek the employer's consent as required by the statute or that consent or treatment was unreasonably withheld, claimant cannot maintain he has suffered any constitutional deprivation, especially when the employer has been determined to be liable for all medical treatment rendered prior to March 7, 1983, the date the Commission determined claimant's temporary total disability ended.

■ Finally, respondent argues the Commission's decision awarding benefits beyond November 1981, the date claimant's original doctor released him to return to work, as well as the circuit court's order reversing the Commission as to medical benefits incurred prior to March 7, 1983, should be reversed. However, respondent did not file a cross-appeal. When a decision contains a specific finding adverse to an appellee, the appellee must file a cross-appeal raising as an issue that adverse finding. (*Ruff v. Industrial Comm'n* (1986), 149 Ill. App. 3d 73, 500 N.E.2d 553.) Having failed to properly preserve these issues for review by filing a cross-appeal, they are waived.

Accordingly, the judgment of the Cook County circuit court is affirmed.

Affirmed.

BARRY, P.J., and McNAMARA, WOODWARD, and CALVO, JJ., concur.