April 29, 1999

NO. 4-97-0899

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

PAXTON-BUCKLEY-LODA EDUCATION ) Administrative

ASSOCIATION, IEA-NEA, ) Review of   

Petitioner, ) Illinois v. 

) Educational

THE ILLINOIS EDUCATIONAL LABOR ) Labor 

RELATIONS BOARD, BETH NUSS, and   ) Relations Board

KIMBERLY KINLEY, ) No. 94-CB-0009-

S

Respondents. )

________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

On August 28, 1997, the Illinois Educational Labor Relations Board (IELRB) issued an opinion and order finding that petitioner
 Paxton-Buckley-Loda Education Association, IEA-NEA (Association), violated section 14(b)(1) of the Illinois Educa­

tional Labor Relations Act (Act) (115 ILCS 5/14(b)(1) (West 1996).  
Paxton-Buckley-Loda Education Ass'n
, 13 Pub. Employee Rep. (Ill.) par. 1114, No. 94-CB-0009-S (Illinois Educational Labor Relations Board, August 28, 1997) (hereafter 13 Pub. Employee Rep. (Ill.) par. 1114).  The Association appeals the IELRB's finding that it violated section 14(b)(1) of the Act as well as the IELRB's remedial order.  We affirm. 

Beth Nuss and Kimberly Kinley are employed by the Paxton-Buckley-Loda Community Unit School District No. 10 (Dis­

trict) as band directors.  The Association is the exclusive bar­

gaining representative for the District's certified employ­ees, including Nuss and Kinley.   

In early 1993, the Association and the District negotiated a new collective-bargaining agreement for 1993-96. 

Nuss and Kinley had previously received 
per
 
diem
 pay for summer band work (not mentioned in previous contracts), but Associa­tion presi­dent John Overstreet and other members of the Association's negotiat­ing team concluded such pay was too high in comparison to other "extra-duty" posi­tions, such as coaching and sponsoring student clubs.  The negotiating team, which had no information regarding the time Nuss and Kinley spent on summer band work, submitted a proposed agreement that added summer band as an extra-duty assignment at a pay rate approxi­mately $1,000 less annually per teacher than the 
per
 
diem
 rate.  

Tentative agreement was reached on the proposed agree­

ment on July 1, 1993.  On July 6, 1993, Overstreet told Kinley for the first time that they had "to make a small pay cut" for Nuss and Kinley by reclassifying summer band as an extra-duty assignment; the cuts were "approximately a few hundred dollars" and "just something that needed to be done."  Overstreet told Kinley that the reclassification had arisen at the end of negotiations and was a necessary concession for contract settlement.  Overstreet alleg­edly stated that he put in more time in football than Nuss and Kinley put in for the entire year.  Overstreet denied making that statement but he admitted he knew the pay cut would be approxi­mately $1,000, and he did not relay that information to Nuss and Kinley.  

Nuss and Kinley determined they would each lose up to $1,000 per year and, on July 10, 1993, met with Mike Short, president of the school board, and with the district's superin­

tendent.  Short stated the pay cut had been represented to him as "small," around "a few hundred dollars."  Short told Nuss and Kinley he could not negotiate with them as individual employees, that they had to resolve the matter through the Association, that the Association had recommended the reclassification in its first proposal, and that the District planned to ratify the agreement.   Nuss and Kinley then met with Gene Vanderport, UniServe Director for the Illinois Education Association, an hour before the Association's vote on ratification.  Vanderport told them that he was not aware of the size of the pay cut and that it was wrong of the Associa­tion not to inform them of the reclas­sifica­

tion.  However, he asked them not to raise the issue at the ratification meeting and told them he would arrange a meeting with the negotiating team about reopening the summer band compen­

sation issue.  In August, sometime after Nuss and Kinley met with the negotiating team, Vanderport sent a letter on behalf of the Association to the District asking that negotiations be reopened.  The District declined to do so.  

On August 15, 1993, Nuss and Kinley received their first checks for summer band work, reflecting amounts calculated at the 
per
 
diem
 rate.  Nuss and Kinley contacted Marlene Stalter, bookkeeper for the District, expressing concern that they had been overpaid.  Stalter told Nuss and Kinley that the new salary did not start until September, that new payroll practices always started on September 1, and no one had told her to pay Nuss and Kinley any differently.  

In September, the District again refused to reopen negoti­a­tions, but in December there was a meeting between Thomas Miller (the District's attorney), Vanderport, and counsel for Nuss and Kinley.  As a result of the meeting an amendment was proposed under which summer band would remain on the extra-duty list, but the percentage of base salary paid for that work would be in­creased to approximate the 
per
 
diem
 rate.  According to Short, the District believed it had an agreement, subject only to the Association and the District signing it.  

Overstreet reported to Nuss and Kinley that an agree­

ment had been reached, subject to negotiation team review and ratification by the Association.  He suggested they would proba­

bly want ratification as soon as possible, so they could get their back pay for summer 1993.  When Nuss and Kinley replied they had received 
per
 
diem
 pay for summer 1993, that the pay cuts were not to start until September, Overstreet immediately ended the conversation and called Stalter regarding how she paid Nuss and Kinley for summer band 1993.  Overstreet told Vanderport that he considered the payments "illegal" and believed Nuss and Kinley had "deceived" them.  In late December 1993 or early January 1994, the Association decided not to pursue the amendment to the agreement that Vanderport had worked out with Miller.  The Association presented the District with a counterproposal agreeing to abide by the original agreement, but providing that Nuss and Kinley would not be required to return the "illegal payment" they had re­ceived.  The District, in a January 12, 1994, letter, refused to sign the counterproposal and stated it would do nothing further since the dispute was between the Association and two of its members.  That letter was the first indication to Nuss and Kinley that the Associa­tion had changed its position.  

In a March 17, 1994, newsletter to Association members, Overstreet wrote that the request to reopen negotiations had been dropped when the negotiating team discovered "several facts had been misrepresented," that the District "incorrectly" paid and the "band teachers incorrectly accepted *** [the] illegal [pay­

ment] *** in August 1993."  

"The facts are that the two teachers did 

receive the money this year, illegally, and 

when the board and press was told that they 

had lost money this year that was not the 

facts [
sic
].  Upon discovering this in 
December
, 

the Associa­tion felt that because of this 

decep­tion we could not in good faith contin­ue 

negotia­tions."  

 On June 30, 1995, Nuss and Kinley filed a complaint with the IELRB alleging that the Association was guilty of an unfair labor practice because of its intentional misconduct in representing employees, in violation of section 14(b)(1).  The administrative law judge (ALJ) issued a recommended decision and order on September 11, 1996, concluding that the Association had violated section 14(b)(1) by reneging on its promise to Nuss and Kinley that it would reopen the agreement.  
Paxton-Buckley-Loda Education Ass'n
, 12 Pub. Employee Rep. (Ill.) par. 1075, No. 94-

CB-0009-S (Illinois Educational Labor Relations Board, Hearing Officer's Recommended Decision and Order, September 11, 1996).  The ALJ found much of Overstreet's testimony unreliable due to his demeanor and numerous inconsis­tencies.  

The Association filed exceptions, but on August 28, 1997, the IELRB 
adopted the ALJ's findings of fact as supplement­

ed and affirmed the ALJ's decision on the merits.  13 Pub. Employee Rep. (Ill.) par. 1114.  The IELRB concluded that the Association and the District had entered into a tentative agree­

ment on December 6, 1993, to restore Nuss and Kinley to their previous level of pay, and the Association failed to submit that agreement to ratification and execution because of personal hostility by Overstreet toward Nuss and Kinley and that such personal hostility caused Overstreet to misrepresent and selec­

tively disclose information about Nuss and Kinley's 1993 band stipend.  The IELRB concluded that Overstreet knew the circum­

stances under which Nuss and Kinley received the 
per
 
diem
 rate for their summer 1993 band work, but never communicated this information to Vanderport or the Association negotiation team.  The IELRB found no evidence that Nuss or Kinley or anyone on their behalf had misrepresented any facts to the District, to the Board, or to the press.  The IELRB concluded Nuss and Kinley were entitled to the value of the agreement tentatively reached between the District and the Association on December 6, 1993.  The IELRB also ordered that a copy of its opinion and order be sent by mail to all members of the Association, that the Associa­

tion cease and desist from restraining or coercing employees in the exercise of rights guaranteed under the Act, and that its order be posted.  The IELRB refused, however, to extend the increased level of pay to the 1996-99 collective-bargaining agreement later negotiated by the Association.      

The IELRB specifically found that the following Association actions did not constitute a violation of its duty of fair representation within the meaning of section 14(b)(1) of the Act:  (1) the Association's initial decision to include summer band in the contract with the resulting loss in salary to Nuss and Kinley; (2) the Association's failure to communicate with Nuss and Kinley about the original reclassification proposal prior to the January 10 meeting; and (3) the Association's initial reluctance to enter or reopen negotiations on the issue of the summer band stipend.  13 Pub. Employee Rep. (Ill.) par. 1114, at IX-389.

On appeal, the Association argues that the IELRB erred in determining that it breached its duty of fair representation in violation of section 14(b)(1) of the Act because no tentative agreement existed between the Association and the District on December 6, 1993, to restore Nuss and Kinley's summer band salaries to approximately the previous level under the 
per
 
diem
 rate.  Furthermore, the Association contends the IELRB erred when it concluded that the alleged tentative agreement was not submitted to ratification and execution due to the personal hostility of Overstreet toward Nuss and Kinley.  The Association also argues that even if we find that it violated section 14(b)(1), the IELRB abused its discretion in fashioning the remedy.

Section 14(b)(1) of the Act provides:

"(b) Employee organizations, their 

agents or representatives or educational 

employees are prohibited from:

(1) Restraining or coercing 

employees in the exercise of the 

rights guaranteed under this Act, 

provided that a labor organization 

or its agents shall commit an unfair

labor practice under this paragraph 

in duty of fair representation 

cases only by intentional misconduct 

in representing employees under this 

Act."  115 ILCS 5/14(b) (West 1996).

The duty of fair representation proceeds from a union's statutory role as the exclusive bargaining agent for its members. 
Jones v. Illinois Educational Labor Relations Board
, 272 Ill. App. 3d 612, 619, 650 N.E.2d 1092, 1097 (1995).  "[T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  
Vaca v. Sipes
, 386 U.S. 171, 177, 17 L. Ed. 2d 842, 850, 87 S. Ct. 903, 910 (1967).

Section 14(b)(1) of the Act expressly requires "intentional misconduct" before a breach of the duty of fair representation is established.  115 ILCS 5/14(b)(1) (West 1996); 
Jones
, 272 Ill. App. 3d at 625, 650 N.E.2d at 1101.  The intentional misconduct standard of section 14(b)(1) of the Act is to be interpreted in accordance with 
Hoffman v. Lonza, Inc.
, 658 F.2d 519 (7th Cir. 1981).  
Jones
, 272 Ill. App. 3d at 627, 650 N.E.2d at 1102.  For a complaining party to establish a breach of the duty of fair representation under the intentional misconduct standard, he must show "substantial evidence of fraud, deceitful action, or dishonest conduct" (
Hoffman
, 658 F.2d at 522, citing 
Amalgamated Ass'n of Street Electric Ry. & Motor Coach Employees of America v. Lockridge
, 403 U.S. 274, 299, 29 L. Ed. 2d 473, 490, 91 S. Ct. 1909, 1924 (1971)), or "'deliberate and severely hostile and irrational treatment'" (
Hoffman
, 658 F.2d at 522, quoting 
Lockridge
, 403 U.S. at 301, 29 L. Ed. 2d at 491, 91 S. Ct. at 1925).  

The Association initially contends that no tentative agreement had been reached between the Association and the District as of December 6, 1993, with respect to restoring Nuss and Kinley's summer band pay, so no basis was shown for the section 14(b)(1) violation.  The Association contends Vanderport's testimony that no tentative agreement was reached and that he had no authority to enter into any agreement was uncontradicted and controlling.

The existence or nonexistence of an agreement is a question of fact for the IELRB.  See 
Sangamon State University Board of Regents
, 5 Pub. Employee Rep. (Ill.) par. 1177, at IX-

429, Nos. 89-CA-0030-S, 89-CA-0035-S (Illinois Educational Labor Relations Board, Hearing Officer's Recommended Decision and Order, November 28, 1989).  An administrative agency's findings and conclusions on questions of fact are deemed 
prima
 
facie
 true and correct, and a reviewing court will not reweigh the evidence or substitute its judgment for that of an administrative agency, but will limit its review to ascertaining whether the administrative agency's findings of fact are against the manifest weight of the evidence.  Nor will a reviewing court upset an agency's credibility determinations.  
Graves v. Pontiac Firefighters' Pension Board
, 281 Ill. App. 3d 508, 514, 667 N.E.2d 136, 140 (1996).  A tentative agreement exists between two parties when a "meeting of the minds" exists.  The existence of a meeting of the minds is determined by the parties' objective conduct rather than by their subjective beliefs since a test based on subjective beliefs would enable a party to evade its contractual commitments.  See 
State Community College
, 6 Pub. Employee Rep. (Ill.) par. 1146, at IX-539, Nos. 89-CA-0001-S, 89-

CA-0033-S, 89-CA-0042-S, 89-CA-0044-S, 90-CA-0006-S (Illinois Educational Labor Relations Board, October 4, 1990) (a meeting of the minds exists when parties reach a verbal agreement on various issues, the parties' chief negotiators agree to recommend ratification of the tentative agreement, celebrate after reaching the agreement, and where the tentative agreement resolved all of the issues that the parties had identified to each other as outstanding issues).   

We conclude that the IELRB's determination that the Association and the District had reached an agreement regarding Nuss and Kinley's summer band pay on December 6, 1993, is not contrary to the manifest weight of the evidence.  Beginning on July 17, 1993, the Association's negotiating team agreed to ask the District to reopen negotiations on the summer band pay issue and seek restoration of Nuss and Kinley's pay and did so, through Vanderport, through correspondence, and at Board meetings.  The Association's goal was achieved on December 6, 1993, when Miller presented the amendment to the agreement, which restored Nuss and Kinley's summer band pay to nearly the 
per
 
diem
 level, to Vander-

port--both orally and in writing--along with the letter Miller sent to the superintendent, which stated that Miller had "worked out" the amendment with Vanderport.

Vanderport testified he told Miller the figures sounded "okay," but that he needed to review them and present them to the Association.  Vanderport also testified that although the Association's negotiating team had to review the amendment, the terms were what the Association was seeking on behalf of Nuss and Kinley.  To the extent Vanderport testified during the hearings that no agreement had been reached, the ALJ specifically found his testimony not credible based on "his demeanor and upon the objective action of all parties involved."  We will not second-

guess this conclusion.  Both the District and Nuss and Kinley accepted the terms, subject only to ratification by the District and the Association.  In addition, when Overstreet spoke with Nuss and Kinley the following day he noted only that the amendment would have to be ratified by the Association. Furthermore, the meeting between the Association and the District on January 10, 1994, was held so that both parties could sign the amendment to the agreement.  There was a "meeting of the minds" as of December 6, 1993, that Nuss and Kinley's summer band pay would be restored according to the terms of the amendment, exactly what the Association had been seeking on their behalf.  

The Association argues the IELRB should have invoked the "missing witness" rule when Nuss and Kinley did not call Miller to testify at the hearing before the ALJ and should have presumed any testimony Miller might have given regarding any agreement reached between the parties would have been unfavorable to Nuss and Kinley's position. 
 
Schaffner v. Chicago & North Western Transportation Co.
, 129 Ill. 2d 1, 22,
 541 N.E.2d 643, 651 (1989); 
Board of Regents of Regency Universities v. Illinois Educational Labor Relations Board
, 208 Ill. App. 3d 220, 233, 566 N.E.2d 963, 972 (1991).  The IELRB did not abuse its discretion when it did not invoke the "missing witness" rule to draw the adverse inference.  See 
Schaffner
, 129 Ill. 2d at 22,
 541 N.E.2d at 651 (whether to use the instruction or permit the argument relating to the "missing witness" is within the sound discretion of the trial court).  Miller was not under the control of Nuss and Kinley and he was equally available to the Association.  See 
Schaffner
, 129 Ill. 2d at 
23, 541 N.E.2d at 652. 

The Association also argues that the IELRB erred when it concluded that the Association did not ratify the amendment to the agreement due to Overstreet's personal hostility toward Nuss and Kinley, resulting in its conclusion that Overstreet engaged in "intentional misconduct" resulting in the section 14(b)(1) violation.  The Association claims the IELRB's finding of deliberate and severe personal hostility by Overstreet is against the manifest weight of the evidence and that the IELRB misapplied section 14(b)(1)'s intentional misconduct standard when it concluded Overstreet's hostility satisfied that standard.  Whether Overstreet's personal hostility constituted the necessary "intentional misconduct" to constitute a breach of duty of fair representation under section 14(b)(1) is a mixed question of law and fact.  An agency's determination on such an issue is to be reviewed under a clearly erroneous standard of review.  
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).

Overstreet's hostility toward the teachers was manifested when he misrepresented the amount of their pay cut in July and, also in July, when he told the teachers they were unfairly paid too much for what they did.  The Association argues the record does not support a finding that these manifestations of hostility had any relationship to the Association's action in January 1994 of refusing to ratify the amendment to the agreement.  The IELRB also specifically found that Overstreet knew the circumstances under which Nuss and Kinley received the 
per
 
diem
 rate for their 1993 summer band work and knew that neither the teachers nor the District engaged in "deception" regarding that payment.  Furthermore, although he communicated to Vanderport and the negotiating team that the teachers had been paid under the 
per
 
diem
 rate, he did not apprise anyone of the circumstances surrounding the August 1993 payment; because of this misrepresentation, the Association refused to ratify the amendment to the agreement.

The IELRB's conclusions that Overstreet's conduct reflected personal hostility toward Nuss and Kinley that constituted "intentional misconduct" resulting in an unfair labor practice, a violation of section 14(b)(1), is not clearly erroneous.  But for Overstreet's intentional misconduct, the amendment to the agreement would have been ratified by the Association.  
In fact, Overstreet testified that he told the Board at the January 10, 1994, meeting that the Association would not sign the amendment to the agreement because (1) Nuss and Kinley were paid under the 
per
 
diem
 rate in 1993, (2) they had "misrepresented their position to him," and (3) it was an illegal payment by the Board and an illegal receipt by the teachers.  Overstreet also testified that the Association submitted its counterproposal due to Nuss and Kinley's deception.  Vanderport expressed the same beliefs based on what Overstreet told him.  Overstreet expressed these views despite the fact that Nuss told him it was customary to pay for summer band on the previous year's contract.  Furthermore, Stalter explained to Overstreet that the District had always paid summer band under the previous year's salary schedule and that she did not know the practice was to be changed in 1993.

The Association attempts to avoid a finding of a section 14(b)(1) violation by contending it acted rationally and within its duty of fair representation when it presented its counterproposal because unions have a "wide range of reasonableness" within which to act during bargaining.  We reject the Association's argument.  Its counterproposal went hand-in-

hand with its refusal to ratify the amendment to the agreement, resulting in the section 14(b)(1) violation and was not a separate act of bargaining.

The Association also appeals the IELRB's remedial order.  The Association first contends that the IELRB erred in requiring the Association to provide a "make-whole" remedy whereby Nuss and Kinley are entitled to the value of the amendment to the 1993-96 agreement.  The Association proposes that, instead, it should be directed to submit the amendment to its membership for ratification because the remedy for failure to submit a tentative agreement for ratification is submission of the amendment for ratification, not a presumption that ratification of the amendment was guaranteed.  

Section 15 of the Act provides that if the IELRB finds a party has committed an unfair labor practice, it is "empowered to issue an order requiring the party charged to stop the unfair practice, and may take 
additional
 
affirmative
 
action
, including requiring the party to make reports from time to time showing the extent to which he or she has complied with the order."  (Empha-

sis added.)  115 ILCS 5/15 (West 1996).  We agree with the parties that the appropriate standard under which to review a remedial order of the IELRB is whether the IELRB's order constitutes an abuse of discretion.  See 
Taylor Warehouse Corp. v. National Labor Relations Board
, 98 F.3d 892, 903 (6th Cir. 1996) (reviewing court will not disturb a remedial order of the National Labor Relations Board (NLRB) unless it constitutes an abuse of discretion because the NLRB's remedial authority is "'"a broad discretionary one, subject to limited judicial review,"'" quoting 
Colfor Inc. v. National Labor Relations Board
, 838 F.2d 164, 167 (6th Cir. 1988), quoting 
Fibreboard Paper Products Corp. v. National Labor Relations Board
, 379 U.S. 203, 216, 13 L. Ed. 2d 233, 241, 85 S. Ct. 398, 406 (1964)).

The purpose of the Illinois State Labor Relations Board (ISLRB) in fashioning a remedy in an unfair labor practice case is to order a "make-whole" remedy that places the "parties in the same position they would have been in had the unfair labor practice not been committed."  
City of Harvey
, 13 Pub. Employee Rep. (Ill.) par. 2031, at X-171, No. S-CA-95-079 (Illinois State Labor Relations Board, July 7, 1997).  The ISLRB has "substantial flexibility and wide discretion to ensure that victims of unfair labor practices be returned to the position that would have obtained had the illegal conduct not occurred."  
County of Cook
, 12 Pub. Employee Rep. (Ill.) par. 3008, at XI-31, Nos. L-CA-95-

017, L-CA-95-018 (Illinois Local Labor Relations Board, January 12, 1996).  These same considerations also apply to the IELRB.  

The IELRB did not abuse its discretion in ordering the "make-whole" remedy when it found that "[b]ut for [Overstreet's] hostile and deceitful conduct, it is reasonable to conclude that the tentative agreement between the Union and the District, reached on December 6, 1993, would have proceeded to ratification and execution."  13 Pub. Employee Rep. (Ill.) par. 1114, at IX-390.  The amendment's provisions contained what the Association had been seeking on Nuss and Kinley's behalf, which would have been ratified by the Association on January 10, 1994, allowing Nuss and Kinley to receive that rate of pay over the life of the 1993-96 agreement.  It would not make sense for the IELRB to order that the amendment be submitted for ratification when it issued its order in 1997, after the 1993-96 agreement has expired.  Moreover, the circumstances under which ratification would take place now are different from those at the time when the Association was seeking the proposal contained in the amendment.  Overstreet could even attempt to block ratification now to vindicate himself. 

The Association also contests the IELRB's order requiring it to mail a copy of its order to all Association members.  The Association argues that mailing an IELRB order is an extraordinary remedy used to correct a situation where the offender has repeatedly committed unfair labor practices or has committed "flagrant," "outrageous," or "pervasive" unfair labor practice conduct, and the IELRB made no such findings regarding the Association's behavior in this case.  
The NLRB has required employers to mail its order when an employer committed flagrant, pervasive, and extensive unfair labor practices so that merely posting a notice would not be sufficient.  
Three Sisters Sportswear Co.
, 312 N.L.R.B. 853, 880 (1993), 
review
 
denied
 
&
 
enforcement
 
granted
, 55 F.3d 684 (D.C. Cir. 1995).  However, "[t]he measure of the Board's remedial power cannot depend solely on the length or frequency of the [e]mployer's conduct:  the crucial factor is the effect of that conduct on the employees."  
Teamsters Local 115 v. National Labor Relations Board
, 640 F.2d 392, 399 (D.C. Cir. 1981) (affirming NLRB's mail order and rejecting employer's argument that mailing is punitive and duplicative in light of order also requiring posting of the order).

We affirm this part of the IELRB's order.  The March 17, 1994, newsletter that Overstreet sent to all Association members accused Nuss and Kinley of "misrepresenting" facts, accepting "illegal" payments, and deceiving the Association.  The IELRB specifically found neither Nuss nor Kinley nor anyone on their behalf misrepresented any facts regarding the 1993 summer band payments.  Because Overstreet mischaracterized their actions and gave them no opportunity to respond, it is appropriate that Association members be made aware of the findings of the IELRB.  Also, because each Association member was given a copy of the March newsletter, each should receive a copy of the IELRB's order, in addition to the decision being posted. 
 Section 15 gives the IELRB the power to fashion necessary affirmative remedies and, although the NLRB has required mailing its order in flagrant and extreme situations, such a finding is not 
required
 before ordering a mailing.  These circumstances warranted such an order.

In their appellee brief, Nuss and Kinley identify several inadequacies in the IELRB's remedy that they claim should be corrected.  Nuss and Kinley argue that the IELRB should have awarded them attorney fees and made the level of pay specified in the amendment to the 1993-96 agreement applicable to the 1996-99 collective-bargaining agreement and to all future agreements.  They also ask that we require the IELRB to order that a copy of the ALJ's decision should be mailed to all Association members along with its decision.

Nuss and Kinley did file a separate appeal in this case; however, this court dismissed their appeal on January 8, 1998, for failure to name a necessary party.  
Nuss v. Illinois Educational Labor Relations Board
, No. 4-97-0881 (January 8, 1998) (dismissal order).  When a decision contains a specific finding adverse to an appellee, the appellee must file a cross-

appeal raising as an issue that adverse finding in order for the reviewing court to consider it.  
Burrgess v. Industrial Comm'n
, 169 Ill. App. 3d 670, 677, 523 N.E.2d 1029, 1034 (1988).  Because the issues Nuss and Kinley raise are not properly before us, we will not consider them.

Nuss and Kinley move for attorney fees in this court pursuant to title 80, section 1120.80 of the Illinois Administrative Code.  80 Ill. Adm. Code §§1120.80(a) through (i) (1996).  We cannot award attorney fees incurred during an appeal pursuant to that section of the Administrative Code, as that provision applies to a party receiving attorney fees upon an order of the IELRB.  However we may award attorney fees pursuant to Supreme Court Rule 375(b) (155 Ill. 2d R. 375(b)) if an appeal is frivolous or not taken in good faith.  An appeal is frivolous if a reasonable, prudent attorney would not in good faith have brought such an appeal.  
First Federal Savings Bank v. Drovers National Bank
, 237 Ill. App. 3d 340, 344, 606 N.E.2d 1253, 1257 (1992).  
We may impose a Rule 375(b) sanction either upon the motion of a party or upon our own initiative.  155 Ill. 2d R. 375(b).  

We conclude that none of the circumstances for granting attorney fees pursuant to Rule 375(b) exist in this case and deny Nuss and Kinley's motion for attorney fees related to this appeal.  In their motion, Nuss and Kinley again argue we should order the IELRB to grant them attorney fees for that part of their case that took place before the ALJ and the IELRB. Again, as we previously concluded, we cannot consider this contention.

We affirm the order of the IELRB.

Affirmed.

STEIGMANN and GARMAN, JJ., concur.