THIRD DIVISION
FEBRUARY 22, 2006

1-04-3223

| | | |
|---|---|---|
| BOARD OF EDUCATION, GRANITE CITY | ) | Petition for Review |
| COMMUNITY UNIT SCHOOL DISTRICT NO. 9, | ) | of an Order of the Illinois |
| | ) | Illinois Educational Labor |
| Petitioner-Appellant, | ) | Relations Board |
| | ) | |
| v. | ) | |
| | ) | |
| LYNNE O. SERED, in her capacity as Chair of the | ) | Nos. 2002-CA-0014S |
| Illinois Educational Labor Relations Board, the ILLINOIS | ) | 2002-CA-0021S |
| EDUCATIONAL LABOR RELATIONS BOARD, and the | ) | |
| GRANITE CITY FEDERATION OF TEACHERS, | ) | |
| LOCAL 743, IFT-AFT, AFL-CIO, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

JUSTICE ERICKSON delivered the opinion of the court:

This case arises from an order and opinion of the Illinois Educational Labor Relations Board (the Board) affirming the decision of an Administrative Law Judge (ALJ) that the Board of Education, Granite City Community Unit School District No. 9 (the District) engaged in unfair labor practices by failing to bargain in good faith. The case stems from two consolidated charges of unfair labor practices filed by the Granite City Federation of Teachers, Local 743, IFT-AFT, AFL-CIO (the Union) against the District.

PROCEDURAL BACKGROUND

The Union alleged in two separate charges that the District violated sections 14(a)(5) and 14 (a)(1) of the Illinois Educational Labor Relations Act (the Act) (115 ILCS 5/14(a)(5), (a)(1) (West 2002)), by failing to bargain in good faith when it bypassed the Union by dealing directly with its employees, unilaterally implemented a supervision schedule, and engaged in regressive bargaining

by reneging on a tentative agreement. The executive director of the Board issued a complaint alleging that the District "withdrew a proposal to which [the Union and the District] had agreed and substituted a proposal, which reduced insurance provisions and increased the number of 'docked days.'" [1]

In October 2002, a hearing was held before the ALJ. In the recommended decision and order, the ALJ dismissed the section of the Union's complaint alleging that the District dealt directly with its employees and unilaterally implemented a supervision schedule, but found that the District violated sections 14(a)(5) and 14(a)(1) of the Act by reneging on an agreement reached on October 6, 2001, and engaging in regressive bargaining.

The District filed exceptions to the ALJ's recommendation, to which the Union responded. Upon review, the Board filed an opinion and order affirming the ALJ's decision. The District timely filed in this court a petition for administrative review. See 735 ILCS 5/3-113 (West 2002).

BACKGROUND

In May 2001, the Union and the District began negotiating for a new collective bargaining

---

[1]Under Illinois law, teachers are only paid for the calender days they actually work. "Dock days" refer to the number of days that a teacher would not be allowed to make up, and thus would receive no pay due to the strike.

agreement (CBA) because the current agreement was due to expire on September 12, 2001. The Union's negotiating team consisted of Laura Aerne, Lee Wilson, Betty Hicks, Amy Alsop, Linda McDonnell, Sonja Stewart, and Terri Millikin. The District's negotiating team consisted of Ron Booth, Jeff Parker, John Caudron, Steve Balen, Cindy Mills, Larry Dew, and Ray Earnisse. Max Aud served as the mediator throughout the negotiations.

The parties engaged in an interest-based bargaining (IBB) negotiation where they "brainstormed" ideas in order to limit the issues and start the discussions. Before the bargaining sessions began, the parties agreed to certain ground rules. These rules mandated that each person keep the discussions of the sessions confidential and that every person attending the session have the authority to make binding agreements. During the IBB sessions, the parties discussed topics such as teacher salary, evaluations, health insurance, class size, "duty,"[2] "dock days," teacher recertification, and extracurricular activities.

On September 17, 2001, unable to reach an agreement, the teachers, represented by the Union, went on strike. The Union stopped using the IBB method, but continued to negotiate using a more traditional bargaining method where each team would meet in separate rooms and the mediator would communicate proposals and ideas between the two rooms. The ground rules concerning confidentiality and authority remained the same. By September 28, 2001, it is undisputed that the

---

[2]"Duty" refers to a teacher's responsibility to supervise the students outside of the classrooms. For example, a teacher may be assigned to or volunteer for hallway duty, lunchroom duty, or bus duty.

parties agreed on all terms except for "dock days."

On October 5, 2001, the parties began an intensive negotiation session at the mediator's office. They began the negotiation using the traditional negotiation method, but failed to reach an agreement on "dock days." Parker, a member of the District's negotiation team, told the mediator that he wanted to propose a solution to the Union where the teachers would incur no "dock days" in exchange for incurring additional 30 minutes of "duty" time per school day. Sometime after midnight on October 6, 2001, the mediator selected two members from the Union team, Aerne and Alsop, and two members from the District team, Parker and Caudron, and isolated them in a room together.

The facts are undisputed that Parker, during that negotiation, made an admitted serious proposal to Aerne and Alsop for no "dock days" in exchange for extra "duties." Aerne and Alsop accepted the proposal, shook hands with Parker and Caudron, and believed that they made an agreement. Because the parties were exhausted from negotiating throughout the night and Parker was to attend a benefit golf tournament early in the morning, they agreed to return at 7 p.m. that evening instead of writing out the agreement immediately. They agreed that the Union team would draft the language regarding "duty" and the extracurricular payment schedule[3] and that the District

---

[3]Teachers who are involved in extracurricular activities, such as the band director or the football coach, are paid based on a payment schedule.

team would draft the language for the remainder of the agreed terms.

Before returning to the mediator's office, the Union team announced to its membership that a meeting would be held to ratify the oral agreement and reserved a hall for the meeting. A District employee, Mills, created a document titled "Tentative Agreement" that encompassed the terms discussed between the parties except for the "duty" language, which was to be drafted by the Union.

When the parties returned to the mediator's office later that evening, the Union team learned through the mediator that there was no longer an agreement. The District team told the mediator that in order to get the agreement ratified, it needed four school board member votes, but was unable to obtain them. At which time, the Union team became upset because it thought that the District team reneged on its agreement, and asked for a new proposal from the District team in writing. The District team took the document titled "Tentative Agreement" and made hand-written cross-outs and additions on it, making substantial changes to "dock days" as well as to nearly all other terms, including those that were undisputedly agreed to in September 2001. It imposed mandatory arbitration for health insurance, required eight "dock days," no "duty" requirement, and changed the recertification language. Without the hand-written changes, the document reflected the agreement that the parties made earlier that day.

The parties eventually ended the strike by ratifying an agreement on October 11, 2001, where the parties agreed to submit the issue of "dock days" to an arbitrator under the grievance procedure. On December 20, 2001, an arbitrator issued an opinion on the issue of "dock days".

On October 3, 2001, the Union filed an unfair labor practice charge with the Board against the District, alleging that the District violated sections 14(a)(5) and 14(a)(1) of the Act by failing to

bargain in good faith. On November 5, 2001, the Union filed a second charge against the District, again alleging that it violated sections 14(a)(5) and 14(a)(1) of the Act. The charges were then consolidated.

On October 15 through 17, 2002, a hearing was held before the ALJ. At the hearing, the testimonies of the parties were in conflict. The ALJ found that the District witnesses were less than credible in their denials of an agreement. The ALJ determined that the District and the Union reached an agreement on October 6, 2001. The Union witnesses testified that the District's team, Parker and Caudron, told the Union team, Aerne and Alsop, that "we had an oral agreement." The record also indicated that the District and the Union had a history of collective bargaining prior to the current CBA. In past negotiations, both Union and District negotiating team members had the authority to make a deal. When presented with a proposal, the District would either (1) accept the deal, (2) deny the deal, or (3) inform the Union that it lacked the authority and thereafter sought approval from the school board on that issue. However, Parker and Caudron never told the Union that they did not have the authority to offer a proposal omitting "dock days" without the school board member's approval. Aerne testified that Parker and Caudron indicated that they had the permission to enter into the agreement.

At the end of the hearing, the District attempted to submit the arbitrator's decision regarding "dock days" into evidence. The ALJ did not allow the decision into evidence, finding it was neither relevant nor material.

On December 8, 2003, the ALJ issued a recommended decision and order finding that the District violated section 14(a)(5) and, derivatively, section 14(a)(1) of the Act. The ALJ found that

the record clearly indicated that the parties entered into an agreement on October 6, 2001, and the District engaged in regressive bargaining by attempting to renegotiate significant portions of the agreement in its favor.  The ALJ ordered the District to cease and desist from refusing to bargain with the Union, cease and desist from interfering with the District's employees in the exercise of their rights guaranteed under the Act, rescind all policies and procedures inconsistent with the October 6, 2001 agreement, and make the Union employees whole for the loss of any pay or benefit resulting from the repudiation of that agreement.  The District filed a statement of exceptions with the Board.  On September 14, 2004, the Board affirmed the ALJ's recommended order.  The District timely filed a petition for administrative review.

ANALYSIS

When a party fails to negotiate in good faith, the collective bargaining process becomes an exercise of unfulfilled expectations and meaningless unenforceable promises. The concept of good faith collective bargaining is at the heart of the labor-management relationship.  It is what insures that agreements made between employers and employees will have the integrity of enforceable agreements that are beneficial to all involved.

An administrative agency's findings on question of fact are deemed to be prima facie true and correct 735 ILCS 5/3-110 (West 2002), and should be upheld unless they are against the manifest weight of the evidence.  Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 88, 606 N.E.2d 1111 (1992).  Under this standard, a reviewing court may overturn the Board's decision only if, after reviewing the evidence in the light most favorable to the Board, it concludes that no rational trier of fact could have reached the Board's conclusion.  Sangirardi v. Village of

7

Stickney, 342 Ill. App. 3d 1, 16, 793 N.E.2d 797 (2003).

The Board's determination that an unfair labor practice has been committed presents a mixed question of law and fact and is subject to the clearly erroneous standard of review. Chicago School Reform Board of Trustees v. Illinois Educational Labor Relations Board, 315 Ill. App. 3d 522, 528, 734 N.E.2d 69 (2000). An agency's decision will be deemed clearly erroneous if the reviewing court, on the entire record, makes a definite and firm conviction that a mistake has been committed. Chicago Teachers Union v. Illinois Education Labor Relations Board, 334 Ill. App. 3d 936, 942, 778 N.E.2d 1232 (2002). Whether an agreement has been created by two parties is a question of fact for the Board. Paxton-Buckely-Loda Education Ass'n v. Illinois Educational Labor Relations Board, 304 Ill. App. 3d 343, 350, 710 N.E.2d 538 (1999) (Paxton-Buckley-Loda).

The District does not dispute that a party violates its duty to bargain in good faith when a party refuses to ratify a tentative agreement and rescinds and substantially modifies the terms of the agreement. See City of Burbank, 4 PERI P2048 (ISLRB 1988) (City of Burbank); Golden Eagle Spotting Co. v. Brewery Drivers and Helpers, Local Union 133, 93 F.3d 468, 471 (8th Cir. 1996).[4] Rather, the District contends that the Board erroneously held that the Union and the District reached an agreement on October 6, 2001. The District argues that there was no agreement reached on October 6, 2001, because there was no meeting of the minds and the agreement was not reduced to

---

[4]The Act provides that Illinois State Labor Relations Board decisions should be considered by the Board. 115 ILCS 5/17.1 (West 2002). Additionally, Illinois courts often look to federal decisions construing the National Labor Relations Act in deciding state labor issues. City of Collinsville v. Illinois State Labor Relations Board, 329 Ill. App. 3d 409, 416, 767 N.E.2d 886 (2002) (City of Collinsville).

writing. It contends that because it did not enter into an agreement, it did not commit an unfair labor practice.

The Union and the Board argue that as this case involves a labor agreement, technical rules of contract do not apply. We agree.

> "'A meeting of the minds of the parties must occur before a labor contract is created. [Citation.] Whether a [CBA] exists is a question of fact; technical rules of contract law are not strictly binding. [Citation.] The existence of a [CBA] does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms.'" City of Collinsville, 329 Ill. App. 3d at 417, quoting Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union, 835 F.2d 1164, 1168 (6th Cir. 1987).

The record supports the Board's finding that the parties entered into an agreement resolving the "dock days" issue on October 6, 2001. Pursuant to the ground rules, both parties were required to have the authority to enter into an agreement. Parker testified that he made a serious proposal to Aerne and Alsop that teachers could incur no "dock days" in exchange for extra "duties" on October 6, 2001. After agreeing to return later that evening to finalize the agreement, the parties agreed that the Union was responsible for drafting the "duty" language and that the District was responsible for drafting the remainder of the document. Both the Union and the mediator were under the impression that the parties had reached an agreement. In addition, the parties' conduct after the negotiation

supports the Board's finding that an agreement was reached. After leaving the negotiation session that morning, the Union announced to its membership that a meeting would be held to ratify the agreement. Mills, a District employee, created a document titled "Tentative Agreement" that memorialized the agreement that the parties reached earlier that morning except for the issue of "duty," which was to be drafted by the Union. In light of the evidence, we find that the Board's conclusion that the District and the Union entered into an agreement on October 6, 2001, was not against the manifest weight of the evidence.

The District also argues that even if an oral agreement was reached on October 6, 2001, it is not bound by the agreement because Parker and Caudron, who engaged in the negotiations on behalf of the District, had neither actual nor apparent authority to enter into it. The District therefore asserts that the Board's findings to the contrary were erroneous.

Contrary to the District's contention, the record supports the Board's findings that Parker and Caudron had authority to enter the October 6, 2001 agreement, as the negotiation ground rules required that each party attending the negotiations have the authority to enter into a binding agreement. Additionally, a designated agent taking part in CBA negotiations is deemed to have apparent authority to bind the principal absent affirmative, clear, and timely notice to the contrary. Kasser Dill Products, 307 NLRB 899 (1992).

The District asserts that it could not cloak its negotiators with apparent authority because such an act would be contrary to sections 10-6 and 10-7 of the School Code. Section 10-6 states in relevant part that "[n]o official business shall be transacted by the [board of school] directors except at a regular or a special meeting." 105 ILCS 5/10-6 (West 2002). Section 10-7 requires that record

10

be kept of official school acts and that "[o]n all questions involving the expenditure of money, the yeas and nays shall be taken and entered on the records of the proceedings of the [school] board." 105 ILCS 5/10-7 (West 2002). The District maintains that these sections together prohibit the enforcement of an agreement against a school district unless actual authoirty has been so given by the district.

The District's argument fails. First, in addition to the District's interpretation of the School Code being tenuous at best, the issues in this case involve whether the District engaged in an unfair labor practice and arose under the Act, not the School Code. Second, section 17 of the Act provides in relevant part that where any other law conflicts with the Act, the Act controls. 115 ILCS 5/17 (West 2002). Third, the cases upon which the District initially relies, including Stahelin v. Board of Education, 87 Ill. App. 2d 28, 230 N.E.2d 465 (1967), and Board of Education of Village Grove Township v. Barracks, 235 Ill. App. 35 (1924) (Barracks), do not support its claim. In addition to being factually distinguishable, both cases were decided prior to the 1984 effective date of the Act. Further as Barracks was decided prior to 1935, it is not binding upon this court and has no precedential value. Sklodowski v. Countrywide Home Loans, Inc., 358 Ill. App. 3d 696, 701, 832 N.E.2d 189 (2005); Universal Underwriters Insurance Co. v. Long, 215 Ill. App. 3d 396, 400, 574 N.E.2d 1284 (1991).

The authorities relied upon by the District in its reply brief, including our supreme court's decision in Board of Education of Rockford School District No. 205 v. Illinois Educational Labor Relations Board, 165 Ill. 2d 80, 649 N.E.2d 369 (1995) (Rockford), and its interpretation of section 10(b) of the Act (115 ILCS 5/10(b) (West 2002)), which prohibits parties engaged in a CBA process

from implementing any provision that is in violation of, inconsistent with, or in conflict with any state law, fare no better.

In Rockford, the school district sent to a tenured teacher who had been involved in an altercation with his students a "notice to remedy" pursuant to section 24-12 of the School Code. After the teacher completed the remedial period, he filed a grievance alleging that the school district's "notice to remedy" violated a provision of the parties' CBA requiring that staff members not be "acted against except for just cause." Rockford, 165 Ill. 2d at 83. The arbitrator found that the CBA's "just cause" provision had been violated and issued an award. Our supreme court disagreed, finding that because the "just cause" provision of the parties' CBA was inconsistent with sections 10-22.4 and 24-12 of the School Code, which provide mandatory procedural requirements for the dismissal of a tenured teacher, including notice, the arbitrator's award was prohibited by section 10(b) of the Act. Rockford, 165 Ill. 2d at 91-92.

Although set forth in less than clear terms, the District appears to analogize this case to Rockford and asserts that because contrary to sections 10-6 and 10-7 of the Act, the CBA did not take place in a regular or a special meeting called by the school board and no roll call vote was taken on the October 6, 2001 oral agreement, which involved the expenditure of district funds, Caudron and Parker lacked authority to enter into it, and the Board was powerless to remedy the District's failure to abide by it. We do not read Rockford as setting forth such a radical interpretation of educational labor relations and negotiations. Further, neither Rockford nor its application of section 10(b) support the District's tenuous position that "no apparent or implied authority may legally exist in Illinois to support the enforcement of any contract or agreement against a School District falling

within the purview of [sections 10-6 and 10-7 of the Act]."  Additionally, <u>Rockford</u> is of limited value, as this case does not involve an arbitration award.

The District also argues that because the parties arbitrated the issue of "dock days" in a grievance procedure pursuant to the agreement entered on October 11, 2001, the Union is prohibited from relitigating the same issue under the doctrine of <u>res judicata</u> and <u>collateral estoppel</u>.

The doctrine of <u>res judicata</u> provides that a final judgment on the merits bars a party to a subsequent litigation of the same claim between the same parties.  <u>Rodgers v. St. Mary's Hospital</u>, 149 Ill. 2d 302, 311-12, 597 N.E.2d 616 (1992).  <u>Res judicata</u> applies if: (1) a court of competent jurisdiction has entered a final judgment on the merits in the first lawsuit; (2) the causes of action are identical; and (3) the parties or their privies are identical in both actions.  <u>Wenig v. Lockheed Environmental Systems & Technologies Co.</u>, 312 Ill. App. 3d 236, 239, 726 N.E.2d 645 (2000).

The doctrine of <u>collateral estoppel</u> prevents a party from relitigating specific issues decided in an action between the same parties in a different claim.  <u>People v. Wouk</u>, 317 Ill. App. 3d 33, 36-37, 739 N.E.2d 64 (2000).  The doctrine requires that: (1) the issue decided in the prior lawsuit is identical to the issue in the present lawsuit; (2) the party against whom the <u>estoppel</u> is asserted was a party or in privity with a party to the prior litigation; and (3) the prior lawsuit resulted in a final judgment on the merits.  <u>Taylor v. Peoples Gas Light & Coke Co.</u>, 275 Ill. App. 3d 655, 660, 656 N.E.2d 134 (1995) (<u>Taylor</u>).

In this case, the doctrines of <u>res judicata</u> and <u>collateral estoppel</u> do not apply.  The arbitration award, which was not admited into evidence, but is included it in the record only as an offer of proof, arose from the parties' agreement to arbitrate the issue of "dock days" pursuant to the

grievance procedure of the October 11, 2001 agreement. The unfair labor practice claim here, on the other hand, arose from the District repudiating the October 6, 2001 agreement and engaging in regressive bargaining. The issue before the Board was whether the District engaged in an unfair labor practice by refusing to bargain in good faith, not how many "dock days" the Union should be able to make up.

The District also contends that the Board imposed an improper remedy. The District argues that the remedy ordering all "dock days" to be made up is inappropriate, harsh, and punitive because the arbitrator, in a grievance procedure, already ruled that the teachers can only make up 11 dock days.

A remedial order of the Board is reviewed under an abuse of discretion standard. Paxton-Buckley-Loda, 304 Ill. App. 3d at 353. The Board's purpose in fashioning a remedy in an unfair labor practice case is to place the parties in the same position they would have been had the unfair labor practice not have occurred. Paxton-Buckley-Loda, 304 Ill. App. 3d at 353. Section 15 of the Act provides that the Board "shall make findings of fact and is empowered to issue an order requiring the party charged to stop the unfair practice, and may take additional affirmative action. 115 ILCS 5 15 West 2002. The Board has wide discretion and substantial flexibility in determining an appropriate remedy. Paxton-Buckley-Loda, 304 Ill. App. 3d at 353-54.

Here, the Board did not abuse its discretion in ordering the "make-whole" remedy when it ordered to rescind all policies and procedures inconsistent with the oral agreement reached on October 6, 2001, and to make the Union employees whole for the loss of any pay or benefits caused by the unfair labor practice. This order places the parties in the same position they would have been had the unfair labor practice not occurred. Thus, the order is not punitive because had the unfair labor practice not occurred, the

parties would not have entered into an arbitration agreement on October 11, 2001.

For the foregoing reasons, we affirm the decision of the Board.

Affirmed.

HOFFMAN, P.J., and THEIS, J., concur.