**NATIONAL LABOR RELATIONS BOARD, Petitioner, Cross–Respondent,**

v.

**BURKART FOAM, INC., Respondent, Cross–Petitioner.**

Nos. 87–1687, 87–1749.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1987.

Decided June 14, 1988.

Joseph H. Bornong, N.L.R.B., Washington, D.C., for petitioner, cross-respondent.

Donald E. Egan, Katten, Muchin & Zavis, Chicago, Ill., for respondent, cross-petitioner.

Before WOOD, Jr. and CUDAHY, Circuit Judges, and WILL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

District 111, Lodge 1076, International Association of Machinists and Aerospace Workers, AFL–CIO (the Union) represented the employees at Burkart Foam, Inc. (Burkart) during 1984 and 1985 when the employees were negotiating for a new contract with Burkart. The Union initiated unfair labor practice charges against Burkart, alleging that Burkart had violated sections 8(a)(1) and (5) of the National Labor Relations Act by refusing to sign the collective bargaining agreement and by refusing to provide the Union with information regarding Burkart's employees. Following a hearing, the Administrative Law Judge (ALJ) determined that Burkart had committed the alleged violations and recommended a remedial order. The National Labor Relations Board (the Board) affirmed the ALJ's decision and adopted the recommended order. The Board now seeks enforcement of its order. Burkart cross-petitions for review of the Board's decision and order.

## I. FACTUAL BACKGROUND

Burkart manufactures and sells urethane foam at its facility in Cairo, Illinois. Since 1965, the Union has represented Burkart's production and maintenance workers in contract negotiations. The last of these contracts expired on September 4, 1984.

Negotiations for the new contract began in August 1984. David Garner was the chief spokesman for the Union. Burkart retained John Noble, Jr., a partner at the Chicago law firm of Katten, Muchin, Zavis, Pearl & Galler, to negotiate the new contract with the Union. Burkart assigned its personnel manager, Lawrence Davis, to assist Noble during the negotiations.

The parties met several times during late August and early September to discuss various proposals. At a meeting on September 1, Burkart presented a written proposal, complete except for the final wage proposal. Burkart proposed that the contract would be in effect from September 4, 1984 until September 5, 1987. On September 4, Burkart presented its final wage proposal to the Union. Burkart proposed a ten percent wage reduction in 1984, a five percent increase from the reduced wage in 1985, and an additional seven and one-half percent increase in 1986. These wage proposals did not specify an effective date, but included a statement that the wage rates would be "effective upon ratification."

Garner presented Burkart's complete proposal at a membership meeting on September 4. The members voted to reject the offer, and the workers subsequently went on strike on September 5.

On October 31, the parties met with a mediator from the Federal Mediation and Conciliation Service. At this meeting, Noble announced that Burkart had not changed its position from the September 4 proposal. Garner responded that the Union's position had changed in one respect: upon settlement of the strike, the Union wanted Burkart to discharge the workers it hired to replace the strikers and to recall striking employees by seniority. Noble replied that Burkart would not agree to that demand. Neither party altered its position, and the strike continued.

On February 7, 1985, the parties met again at the insistence of the mediator. Burkart rejected several proposals by the Union, including the Union's request that Burkart discharge the replacements and reinstate the striking workers. Noble stated that Burkart's proposal of September 4 would not be changed "one iota." The bargaining session ended with the negotiations again at an impasse.

On February 10, the Union's membership, by a vote of 95–67, again rejected Burkart's September 4 offer. Four days later, however, Garner received a petition

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

signed by 130 Union members urging him to accept Burkart's offer and call off the strike.

On February 20, Garner and two other Union representatives met with Davis, Burkart's personnel manager. (Noble was hospitalized during the latter part of February and was unable to meet with the Union.) Garner announced that the Union unconditionally accepted Burkart's September 4 proposal as it was offered at the February 7 meeting.

Garner presented Davis with a document purportedly outlining Burkart's contract proposals. Garner and Davis checked Garner's document against Davis's notes from the meetings on September 1 and September 4 to ensure that the draft accurately reflected Burkart's offer. The two men found several passages that did not match Davis's version of the offer. Garner changed his draft to correspond to Davis's notes, and both men initialed the changes. Garner's draft listed September 5, 1984, September 5, 1985, and September 5, 1986 as the effective dates for each annual adjustment in the rate of pay. Garner and Davis did not discuss these dates, and did not modify the effective dates listed on Garner's draft.

As the meeting concluded, Garner gave Davis a letter dated February 20, 1985. The letter stated that the Union unconditionally accepted Burkart's final offer as discussed in the September 4, October 31, and February 7 meetings between the parties. Garner's letter also requested a list of the permanent replacements that Burkart had hired and a separate list of strikers who had returned to work during the strike. In addition, the letter stated: "The employees will return to work on Thursday, February 21, 1985. Those not put to work will be on the preferential recall list."

After reading the letter, Davis told Garner that the strikers could not return to work because Burkart had replaced them.

Davis also explained that he could not sign any agreement unless Noble approved it.

Following the February 20 meeting, Garner called Davis several times, trying to set up a meeting to sign the agreement. On February 22, the Union picketers changed their signs from "On Strike Machinists Union 1076" to "Employer Has Refused To Sign The Agreed Upon Contract." Finally, on February 27, Garner wrote to Davis, reiterating the Union's desire to sign the agreement and that the strikers were available and willing to return to work.

On March 6, 1985, Noble, on behalf of Burkart, replied to the Union's February 20 and February 27 letters. Noble expressed doubts that the Union represented a majority of Burkart employees. Noble also declined to provide the Union with the employee information Garner had requested because of Burkart's fears that the Union's sole purpose was to discipline and fine members who had crossed the picket line.

Garner responded to Noble in a letter on March 18, 1985. Garner disputed most of Noble's letter, and reiterated the Union's willingness to sign the agreement. Garner also stated that he would like Burkart to state in writing its commitment to rehire the strikers when openings arose. Finally, Garner renewed his request for information, adding that the Union would accept the information without the return dates of the former Union members who had left the strike and without a separate list of employees who had crossed the picket line.

There was no further communication between Burkart and the Union. Burkart continued to refuse to sign the agreement and to provide the Union with the information it had requested.

On July 24, 1985, the Regional Director issued a complaint against Burkart, alleging that Burkart had violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1982).[1]

---

**1.** These sections provide:
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .
(5) to refuse to bargain collectively with the representatives of his employees. . . .
29 U.S.C. § 158(a)(1), (5) (1982).

Following a hearing, the ALJ issued his decision that Burkart had committed the alleged violations. The ALJ further found that the economic strike that had commenced at Burkart's plant on September 5, 1984 was converted into an unfair labor practice strike on February 25, 1985.[2]

Burkart filed exceptions to the ALJ's decision. On March 26, 1987, the Board affirmed, without comment, the ALJ's decision and adopted his recommended remedial order.[3]

The Board petitions for enforcement of its order; Burkart cross-petitions for review of the order. We have jurisdiction over this petition under National Labor Relations Act § 10(e)-(f), 29 U.S.C. § 160(e)-(f) (1982).

## II. STANDARD OF REVIEW

We will uphold a decision of the Board if it is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *NLRB v. Lewis Univ.*, 765 F.2d 616, 620 (7th Cir.1985). In reviewing the Board's decision, we must scrutinize the entire record, "including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn." *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir.1977). Nevertheless, a reviewing court must uphold the Board's choice between two fairly conflicting views. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465. *See NLRB v. Harvstone Mfg. Corp.*, 785 F.2d 570, 574 (7th Cir.) (if the Board's decision is supported by substantial evidence, the reviewing court must uphold that decision even if the court would reach a different conclusion on the same evidence), *cert. denied,* —— U.S. ——, 107 S.Ct. 88, 93 L.Ed.2d 41 (1986).

## III. DISCUSSION

Burkart argues that the parties never entered into an agreement. To support this contention, Burkart asserts that the parties did not reach an agreement on certain major contract terms, including reinstatement of the strikers and effective dates for the contract. Burkart also argues that it had no obligation to supply the Union with the requested information because there was a clear and present danger that the Union would retaliate against employees who had crossed the picket line during the strike.

### A. Burkart's Refusal to Execute the Agreement

■ An employer who refuses to execute a written contract incorporating the agreement reached with a union commits an unfair labor practice. *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 525–26, 61 S.Ct. 320, 325–26, 85 L.Ed. 309 (1941); *Capitol–Husting Co. v. NLRB*, 671 F.2d 237, 245 (7th Cir.1982). "Whether or not an agreement has been reached between two parties is a question of fact for the Board to determine." *Capitol–Husting*, 671 F.2d at 243. Burkart claims that substantial evidence does not support the Board's determination that Burkart and the Union actually reached an agreement.

■ Burkart relies on common law principles of contract law in arguing that the Union did not accept Burkart's offer. In reviewing the Board's determination that Burkart and the Union did reach an agreement, we may look to traditional rules of contract interpretation consistent with federal labor policies. *John Wiley & Sons v. Livingston*, 376 U.S. 543, 548, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964). Neverthe-

---

**2.** The strikers changed their signs on February 22 to protest Burkart's refusal to sign the agreement. The ALJ, however, found that because the parties needed time to have the contract retyped and to arrange a date for signing the contract, February 25 was a more reasonable date upon which to conclude that Burkart was refusing to sign the agreement.

**3.** The order requires Burkart, *inter alia,* to execute the collective bargaining agreement; upon application, offer reinstatement to all unfair labor practice strikers not lawfully replaced during the economic strike; make each employee whole for any loss of earnings he or she suffered by reason of Burkart's refusal to execute the agreement; and provide the Union with the information outlined in the Board's decision.

less, the Board and the courts are not bound by the rules of contract law. *Transportation–Communication Employees Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 160–61, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966); *Capitol–Husting*, 671 F.2d at 242. Accordingly, the Board and the courts have held that "the common law rule that a rejection or counterproposal necessarily terminates the offer has little relevance in the collective bargaining setting." *Pepsi–Cola Bottling Co. v. NLRB*, 659 F.2d 87, 89 (8th Cir.1981). *Accord Presto Casting Co. v. NLRB*, 708 F.2d 495, 497–98 (9th Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); *Georgia Kraft Co., Woodkraft Div. v. NLRB*, 696 F.2d 931, 937–38 (11th Cir. 1983), *vacated and remanded on other grounds*, 466 U.S. 901, 104 S.Ct. 1673, 80 L.Ed.2d 149 (1984); *Capitol–Husting*, 671 F.2d at 244. In the collective bargaining context, an offer will remain on the table unless the offeror explicitly withdraws it or unless circumstances arise that would lead the parties to reasonably believe that the offeror has withdrawn the offer. *Pepsi–Cola*, 659 F.2d at 90; *Capitol–Husting*, 671 F.2d at 244.

■ Burkart extended its final offer to the Union on September 4, 1984. At the later bargaining sessions on October 31, 1984 and February 7, 1985, Burkart continued to adhere to its September 4 proposal. Thus, the September 4 offer remained on the bargaining table on February 20, 1985, when the Union accepted it.

At the February 20 meeting between Garner and Davis, Garner stated that the Union wished to unconditionally accept Burkart's September 4 offer. Garner and Davis then reviewed Davis's notes of the September 4 meeting, and revised Garner's draft to reflect Burkart's proposal. At that meeting, Garner also presented a letter to Davis that stated: "Effective immediately upon receipt of this letter, Local Lodge 1076, International Association of Machinists and Aerospace Workers unconditionally accepts Burkart Foam, Inc's., [sic] final offer and conditions discussed in the September 4, 1984, October 31, 1984

and February 7, 1985 meetings between Union and Company representatives." We do not see how the Union could have been more clear in expressing its intent to accept unconditionally Burkart's September 4 proposal.

### 1. Reinstatement of Strikers

■ Burkart claims that the parties did not reach an agreement because the Union conditioned its acceptance of Burkart's final offer on Burkart's reinstatement of the strikers. We recognize that "when two parties disagree over a major contract term, there is no agreement, or 'meeting of the minds,' and the agreement is not considered a valid contract." *United Paperworkers Int'l Union, Local No. 200 v. Wells Badger Indus., Inc.*, 835 F.2d 701, 704 (7th Cir.1987). Nevertheless, we do not find such disagreement here.

At the October meeting, the Union proposed that, upon settlement of the strike, Burkart should lay off replacement employees hired during the strike and reinstate the strikers by seniority. Noble, on behalf of Burkart, unequivocally rejected that proposal and reiterated that Burkart would not depart from its September 4 offer. Thus, when the Union "unconditionally" accepted Burkart's offer, they were impliedly abandoning their contractual condition that Burkart recall the strikers. The mere fact that the Union had earlier suggested other proposals did not prevent it from accepting Burkart's offer. *See Presto Casting*, 708 F.2d at 497–98 (employer's final contract offer susceptible to acceptance, even though the union had made counteroffers, and the employees had voted to reject the offer and subsequently went on strike); *Capitol–Husting*, 671 F.2d at 244 (the fact that the union continued to bargain for a different agreement did not mean that the employer's original offer was effectively withdrawn); *Shawn's Launch Serv., Inc.*, 261 N.L.R.B. 836, 839 (1982) (even if union's inquiry amounted to a counterproposal, it would not constitute rejection of employer's offer, which was never withdrawn).

Burkart finds significant the fact that, even after unconditionally accepting Bur-

kart's offer, the Union continued to press Burkart to reinstate the strikers. We, however, do not find the Union's actions contradictory. When the Union agreed to accept a contract on Burkart's terms, the Union lost any contractual means of ensuring that the strikers would be reinstated. Nevertheless, the Union had every right to continue to request that Burkart recall the strikers. The Board found that the Union was not making a new contract proposal, but was simply attempting to promote an idea to take place upon settlement of the strike. *See Georgia Kraft*, 696 F.2d at 936–37.

If employees who participate in an economic strike unconditionally apply for reinstatement, they have a right to an offer of reinstatement "[i]f and when a job for which the striker is qualified becomes available." *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967); *accord Laidlaw Corp. v. NLRB*, 414 F.2d 99, 103–05 (7th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). Thus, the Union could merely have been trying to secure its members' right to reinstatement. In fact, as the ALJ's decision noted, this was apparently how Burkart interpreted the Union's request that Burkart recall the strikers. In his letter to Garner on March 6, 1985, Noble acknowledged that the Union "request[ed] notification concerning the procedure by which unconditional application may be made by non-working employees to return to work." Thus, substantial evidence supports the Board's finding that the Union's continued insistence that Burkart recall the strikers did not constitute an added condition to the agreement the parties reached on February 20, 1985.

2. Effective Dates of the Wage Provision

■ Burkart also contends that the parties did not reach an agreement as to the effective dates of the wage proposal. Burkart's September 1 proposal specified that the contract would be in effect from September 5, 1984 until September 5, 1987. Burkart's September 4 proposal reiterated that the contract term for the non-wage provisions would be from September 5, 1984 to September 5, 1987. The wage appendix showed three columns of numbers under the headings "1984," "1985," and "1986," with a statement that the wage rates would be effective upon ratification.

At the February 20 meeting, after the Union unconditionally accepted Burkart's offer, Garner and Davis reviewed the contract that the Union had prepared and corrected the inaccuracies. In the wage appendix, the Union had provided the headings: "September 5, 1984," "September 5, 1985," and "September 5, 1986." Although Garner and Davis did make changes to the wage appendix, they did not amend the dates.

Burkart argues that, by the terms of its September 4 proposal, the effective date for the wage rates should have been February 20, the date of its alleged ratification. Because the Union proposed September 5 as the effective date, Burkart insists that there was no meeting of the minds.[4] Burkart's reliance on the "effective upon ratification" language is to no avail. The September 4 proposal specifically listed 1984 as the initial year in which the wage rates would take effect. In addition, Garner and Davis both reviewed the Union's draft on February 20 and yet did not change the effective dates. Finally, Burkart actually implemented the proposed wage rates on September 5, 1984 and September 5, 1985, which is some evidence of their intent as to the effective dates. *See Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370 (7th Cir.1985) (employer's conduct, including paying wages commensu-

---

4. In Noble's March 6, 1985 letter, the only reason he gave for Burkart's refusal to sign the contract was that Burkart doubted that the Union continued to represent a majority of the employees; Noble did not mention any confusion over the effective dates. While that omission is not dispositive, if there truly was a misunderstanding concerning the effective dates, Burkart could have notified the Union and required it to correct the error at that time, since the Union was unconditionally accepting Burkart's offer.

rate with those listed in the collective bargaining agreement, was sufficient to manifest an intent to be bound by the agreement, even though the employer refused to sign it). *Cf. Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir.1988) ("Employers may adopt a collective bargaining agreement by a course of conduct."); *United Paperworkers*, 835 F.2d at 704 ("for a collective bargaining agreement to be found, '[a]ll that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement'") (quoting *Capitol–Husting*, 671 F.2d at 243).

Burkart also relies on *Century Papers, Inc.*, 126 L.R.R.M. (BNA) 1360 (1987), and *Mercedes–Benz of N. Am., Inc.*, 258 N.L.R.B. 803 (1981). In those cases, the Board found that the parties failed to agree on effective dates for the contract, indicating that there was no meeting of the minds. In both cases, the employer's final proposal did not include a specific commencement date for the contract. *Century Papers,*

126 L.R.R.M. (BNA) at 1360; *Mercedes–Benz*, 258 N.L.R.B. at 803. Burkart, however, stated in its final proposal that the contract would be effective from September 5, 1984 to September 5, 1987.

We conclude that the Board had before it sufficient evidence for a reasonable person to find that the parties agreed on September 5, 1984, September 5, 1985, and September 5, 1986 as the effective dates for the wage provisions.[5] *See Universal Camera*, 340 U.S. at 477, 71 S.Ct. at 459. As in *Capitol–Husting*, "[a]lthough we admit that this is a close factual question, we cannot declare the Board's finding of an agreement erroneous under our substantial evidence standard of review." 671 F.2d at 243. Burkart was therefore obligated to execute a contract embodying that agreement, and its failure to do so was an unfair labor practice. *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 525–26, 61 S.Ct. 320, 325, 85 L.Ed. 309 (1941); *Capitol–Husting*, 671 F.2d at 245.[6]

**5.** Burkart argues that the ALJ's decision implied that February 20, 1985 was the effective date of the contract because the ALJ found that Davis did not have authority to change or compromise Burkart's proposal that the wage rates be effective upon ratification. (We suppose that if the ALJ had found February 20 to be the effective date, Burkart would claim that Davis did not have authority to change Burkart's proposals that the contract would be in effect from September 5, 1984 to September 5, 1987 and that the wage rates were for the years 1984, 1985, and 1986.) However, the ALJ's decision, which the Board adopted, clearly found that Burkart had proposed September 5 as the effective date for the wage provisions.

Burkart also tries to invent confusion concerning the termination date of the contract. As Burkart points out, however, the September 4 proposal, as well as the Union's draft, unequivocally listed September 5, 1987 as the contract's expiration date.

**6.** Employees who go on strike to protest an unfair labor practice are entitled to reinstatement and back pay if they unconditionally offer to return to work. Unlike economic strikers, unfair labor practice strikers have this right even if the employer has hired permanent replacements. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379 n. 5, 88 S.Ct. 543, 546 n. 5, 19 L.Ed.2d 614 (1967); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956); *NLRB v. Jarm Enters., Inc.*, 785 F.2d 195, 202 (7th Cir.1986). An employer's

unfair labor practice will convert an economic strike into an unfair labor practice strike only where there is substantial evidence that the unfair labor practice prolonged the strike. *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1079–80 (1st Cir.1981); *Burlington Homes, Inc.*, 246 N.L.R.B. 1029, 1032 (1979); *Robbins Co.*, 233 N.L.R.B. 549, 558 (1977); R. Gorman, Labor Law 339–40 (1976). *See NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 754 (7th Cir.) ("A strike which is caused in whole or in part by an employer's unfair labor practice is an unfair labor practice strike."), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981).

Burkart claims that "even if Burkart were required to execute the contract, its refusal to provide the information [that the Union requested] would not have converted the economic strike into an unfair labor practice strike." This argument ignores the fact that refusing to execute the agreement was itself an unfair labor practice. *See H.J. Heinz*, 311 U.S. at 525–26, 61 S.Ct. at 325; *Capitol–Husting*, 671 F.2d at 245. After Burkart refused to sign the agreement, the Union changed its picket signs to protest Burkart's refusal to sign the contract, and continued the strike. Burkart does not contradict this evidence or present any other evidence tending to show that Burkart's failure to execute the agreement did not prolong the strike. Therefore, we find that substantial evidence supports the Board's finding that Burkart's refusal to execute the contract converted the economic strike into an unfair labor practice strike on February 25, 1985.

## B. Burkart's Refusal to Provide Information

█ In his February 20, 1985 letter, Garner, on behalf of the Union, requested Burkart to provide a list of the names, addresses, telephone numbers, and seniority dates of employees hired to replace the strikers. Garner also requested a separate list of strikers who had returned to work during the strike, including the dates on which they returned to work. In addition, Garner asked Burkart to supply a list of strikers who were not recalled after the strike and the reasons they were not recalled. The Board found that Burkart's refusal to provide this information was an unfair labor practice and ordered Burkart to provide the information.[7] We agree with the Board's determination.

Section 8(a)(5) of the National Labor Relations Act requires employers to bargain in good faith with the majority representative of its employees. This obligation includes "the duty to furnish information relevant to a labor union's proper performance of its duties under a collective bargaining agreement." *NLRB v. Pfizer, Inc.*, 763 F.2d 887, 889 (7th Cir.1985). The Board found that, with the exception of the dates that strikers returned to work, the information that the Union requested of Burkart was relevant.

█ Burkart does not dispute that the Union is entitled to the information that the Board ordered Burkart to disclose. Rather, Burkart claims that it could properly refuse to provide the information because Burkart had a justifiable fear that its employees would be harassed. Unions may not seek information merely for the purpose of harassing employees. *See Western Mass. Elec. Co. v. NLRB*, 589 F.2d 42, 48 (1st Cir.1978). Employers may defend against a request for information by showing that there is a clear and present danger that the union will use the information to

harass employees. *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1094 (1st Cir.1981). As the First Circuit found, "the 'clear and present danger' defense is likely to be sustained where the company articulates a reasonable good faith fear of harm to striker replacements, offers to explore alternative forms of disclosure acceptable to both parties, and the union refuses to consider any such alternatives." *Id.* at 1095.

Burkart claims that the Union had repeatedly threatened to fine and punish former members who crossed the picket line and returned to work.[8] To support this statement, Burkart relies solely on the March 6, 1985 letter from Noble to Garner. In that letter, only one paragraph dealt with the Union's request for information. That paragraph stated, in full:

3) Your February 20 letter requests the reporting of names of current working employees, dividing them into newly-hired employees and those strikers who have resigned union membership and crossed the picket line since September 5, 1984. The request would appear to have been made for the sole purpose of enabling Lodge 1076 to identify those resigned members it has consistently threatened to discipline and fine. The Company will not participate in that scheme, especially in light of recent rulings by the NLRB finding such union conduct unlawful.

Burkart does not point to any specific instances in which the Union made the alleged threats. Unlike the cases Burkart relies on, here there is no evidence of numerous incidents of union violence and harassment of replacements preceding the request for employees' names and addresses. *See Soule Glass*, 652 F.2d at 1097 (violence against replacements included broken windows, slashed tires, assaults,

---

**7.** The Board, adopting the ALJ's decision, found that the Union had no need for the dates on which the strikers returned to work. Thus, Burkart was not ordered to provide this information. In addition, we note that the Union, in its March 18, 1985 letter, withdrew its request for separate lists of non-Union replacements and

former Union members who had crossed the picket line and returned to work.

**8.** Even if Burkart's allegation were true, it would not excuse Burkart from providing the names of the permanent replacements who were not former Union members.

and verbal threats); *Shell Oil Co. v. NLRB*, 457 F.2d 615, 616 (9th Cir.1972) (parties stipulated that violence against the employees who returned to work during the strike occurred both during the strike and for an indeterminate period after the strike ended); *Sign & Pictorial Union Local 1175 v. NLRB*, 419 F.2d 726, 738 (D.C. Cir.1969) (uncontested facts revealed that striking employees harassed, threatened, and assaulted replacements). Thus, we agree with the ALJ's finding that Burkart has provided no evidence that it had a basis for a reasonable, good faith belief that the Union intended to harass the resigned members. *See United Aircraft Corp. v. NLRB*, 434 F.2d 1198, 1207 (2d Cir.1970) (company required to disclose information where there was "no evidence ... that the unions would use the list of addresses to go to the employees' homes for violent purposes"), *cert. denied*, 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971).

 Even if we were to find that Burkart did have a reasonable good faith fear of Union retaliation against its employees, Burkart would also have to show that the Union was asked for and refused to provide assurances that the employees would not be harassed. In both *Soule Glass* and *Shell Oil*, the employers proposed alternative means of providing the requested information, but the unions failed to pursue discussion of the alternatives. *Soule Glass*, 652 F.2d at 1097; *Shell Oil*, 457 F.2d at 619. The record in this case, however, reveals that Burkart never proposed alternatives or even requested assurances that the Union would not use the information for improper purposes.

Nevertheless, the Union did make an attempt to provide Burkart with assurances. In his March 18, 1985 reply to Noble, Garner explained:

> [W]e simply asked for information that we are entitled to by law and your assertion that our request for this information is to enable us to identify those members who crossed the picket line makes ... little sense.... I assure you that we know each and every one of the members who crossed the picket line as well as

when they crossed and when they finally resigned from the Union. We did not ask for and do not need the information for that purpose. If that is your sole concern, let me assure you that we would accept the information requested with everyone listed together so long as you give us their names, addresses, phone numbers, and dates of hire.

Instead of being assured, Burkart claims that the "ominous passage" stating that the Union already knew the names of the members who had crossed the picket line merely reinforced Burkart's fears that the Union intended to carry out its threats to retaliate against those employees. It is true that the Union did not explicitly state that it would not retaliate against the employees who had crossed the picket line; the Union merely said that the requested information was not necessary for it to do so. While such a statement may not erase Burkart's fears of retaliation, it does assure Burkart that the information will not aid the Union in retaliating. That is sufficient to assure Burkart that there is no " 'clear and present danger that the union will *use the information* to incite violence or harassment of employees.' " *Soule Glass*, 652 F.2d at 1094 (quoting R. Gorman, Labor Law 416 (1976)) (emphasis added).

 The cases that Burkart cites are readily distinguishable because in those cases the unions refused to provide *any* assurances that the information would not be used for improper purposes. *See Soule Glass*, 652 F.2d at 1097 ("The union offered no assurances that the names would not be misused."); *Shell Oil*, 457 F.2d at 617 (although the company was concerned that a list of employees who had crossed the picket line would fall into the hands of union members who had already committed acts of violence, "[t]he General Counsel conceded that *no assurances* had ever been given to the Company by the Union concerning the confidential usage and safeguarding of the names and addresses") (emphasis in original); *Sign & Pictorial Union*, 419 F.2d at 738 (union refused to provide assurances that the requested information would not be used to harass members).

Thus, we find that even if Burkart had a justifiable fear that the Union would harass employees who had crossed the picket line, substantial evidence supports the Board's finding that Burkart has not satisfied the other requirements of a clear and present danger defense. Burkart did not seek assurances from the Union or suggest alternatives that would be acceptable to both parties. Moreover, the Union did provide assurances to Burkart that the information would not be used to harass the employees and even suggested placing all the names on a single list so that the employees who had crossed the picket line would not be identified as such.

## IV. CONCLUSION

Upon review of the whole record, we find that substantial evidence supports the Board's decision that Burkart and the Union reached an agreement on February 20. Burkart committed an unfair labor practice when it refused to execute the contract. Because this prolonged the strike, the economic strike converted into an unfair labor practice strike. Finally, Burkart committed an unfair labor practice in failing to disclose information to the Union as the Board ordered. The Board's decision and order is

ENFORCED.