# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3807

_____

Sound Check, Inc.,

    Plaintiff - Appellee,

v.

American Federation of Television
and Radio Artists,

    Defendant - Appellant.

Appeal from the United States
District Court for the
District of Minnesota.

_____

Submitted:  October 20, 1999

Filed:  February 28, 2000

_____

Before WOLLMAN, Chief Judge, LAY and LOKEN, Circuit Judges.

_____

LOKEN, Circuit Judge.

The American Federation of Television and Radio Artists ("AFTRA") is a national labor union representing radio and television performers. Advertising agencies and production companies -- referred to in this case as producers -- hire AFTRA members to make radio and television commercials. Some producers contract with independent payroll companies to provide administrative services, including the payment of wages and benefits to performing artists who are working under the direction of the producer. This case involves a dispute between AFTRA and Sound

Check, Inc., over whether Sound Check is a producer or a payroll company for purposes of the applicable collective bargaining agreements. Sound Check commenced this action under the federal labor laws and the Federal Arbitration Act to compel arbitration of the dispute under the collective bargaining agreements' broad arbitration clauses. See 9 U.S.C. § 4. AFTRA now appeals the district court's[1] order compelling arbitration, arguing that producer status is a non-arbitrable, pre-contract-formation issue reserved for the union's unilateral determination. We affirm.

**1. The Collective Bargaining Context.** AFTRA negotiates nationwide collective bargaining agreements. The relevant agreements in this case are the Television Recorded Commercials Contract and the Radio Recorded Commercials Contract (the "Commercials Contracts"). The full Commercials Contracts are not in the record; indeed, the employer parties to these Contracts are not identified. But it is uncontested that the various Commercials Contracts, like most collective bargaining agreements, contain broad arbitration clauses. Specifically, the Commercials Contracts for the years at issue provide:

> All disputes and controversies of every kind and nature whatsoever between any Producer and the Union or between any Producer and any performer arising out of or in connection with this Contract . . . as to the existence, validity, construction, meaning, interpretation, performance, nonperformance, enforcement, operation, breach, continuance, or termination of this Contract . . . shall be submitted to arbitration . . . .

A producer wishing to hire AFTRA members to produce television or radio commercials must agree to be bound by the applicable Commercials Contract. If the producer uses an independent payroll company, that company must agree to pay collectively bargained wages and benefits to AFTRA performers and to the union's

---

[1]The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota.

benefit funds.  AFTRA obtains these commitments by having producers and payroll companies submit Letters of Adherence by which they agree to be bound by the terms and conditions of the applicable Commercials Contract.  The Letter of Adherence is a standard form bearing the union's preprinted signature which AFTRA distributes to producers, payroll companies, and other interested employers.

One AFTRA policy is that its members should not deal with non-union producers.  This policy would be frustrated if a non-union producer could hire AFTRA members for some jobs by relying on its payroll company's Letter of Adherence.  Therefore, the standard Letter of Adherence form asks the employer whether it is signing as a producer or a payroll company.  Because only producer status gains the employer access to hiring AFTRA members, there is an incentive for a payroll company to falsely claim producer status.  Therefore, the AFTRA Letter of Adherence includes the following provision:

> AFTRA reserves the right to review executed Letters of Adherence to determine if [] Producer is a bona fide Producer . . . under the . . . Commercials Contract.  AFTRA reserves the right to reject the signatory status of any company that is not a legitimate Producer of . . . Recorded Commercials.

**2.  The Sound Check/AFTRA Relationship.**  Sound Check styles itself a "professional employer organization."  It offers a variety of services to its clients in the television and radio recording industry.  In the ten years prior to this dispute, Sound Check signed and submitted to AFTRA a number of Letters of Adherence, most of which identified Sound Check as a producer of radio and television commercials.  In the summer of 1997, AFTRA sent Sound Check a questionnaire regarding its producer status.  Sound Check did not respond.  On December 8, 1997, Sound Check submitted Letters of Adherence for the new 1997-2000 Commercials Contracts, again identifying

-3-

itself as a producer. In January 1998, AFTRA sent Sound Check another questionnaire regarding its producer activities. Again, Sound Check did not respond.

Though Sound Check's failure to respond and AFTRA's own investigation raised doubts as to the company's producer bona fides, AFTRA continued to do business as usual with Sound Check until July 22, 1998. On that day, the Union sent Sound Check a letter demanding the requested information by August 14 and advising that "Sound Check will be accepted as a signator only if it complies with AFTRA's requirements and AFTRA determines that it is an appropriate signator based on its status as a producer." When Sound Check did not provide the requested information, AFTRA declared that it was rejecting Sound Check's signator status effective December 8, 1997. Sound Check demanded arbitration of this decision under the Commercials Contracts. AFTRA refused to arbitrate on the ground that Sound Check had been rejected as a signator to those Contracts. This lawsuit followed.

**3. Analysis.** "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Tech., Inc. v. Communications Workers, 475 U.S. 643, 648 (1986). Despite the "presumption of arbitrability for labor disputes," id. at 650, AFTRA contends this dispute is not arbitrable because it unilaterally rejected Sound Check as a signator to the Commercials Contracts, which thereby deprived Sound Check of status to compel arbitration. Like the district court, we disagree.

AFTRA's argument that its dispute with Sound Check cannot be arbitrable because no contract with Sound Check ever came into existence is plainly unsound. "As counterintuitive as it may seem, under *Prima Paint [v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967),]* a dispute over the making of a contract can arise out of that same contract, and thus be subject to arbitration." Houlihan v. Offerman & Co., 31 F.3d 692, 695 (8th Cir. 1994). Here, we know the Commercials Contracts exist. They call for arbitration of "[a]ll disputes and controversies of every kind and nature whatsoever

-4-

between any Producer and the Union . . . arising out of or in connection with this Contract," including disputes over "the existence" of the contract. The parties dispute whether Sound Check is a producer "in connection with" the Commercials Contracts. AFTRA has not put the full Commercials Contracts into the record or even identified the other contracting parties. For all we know, Sound Check is a member of multi-employer organizations that negotiated the Commercials Contracts, and the Contracts give Sound Check the right to sign Letters of Adherence. In that case, the dispute would not be over the existence of a contract, but only whether this employer should be given producer or payroll company status. Moreover, though AFTRA now contends there is no contract, it permitted Sound Check to perform under the 1997-2000 Commercials Contracts for some eight months before attempting to deny signator status retroactively. Performance is evidence that a party intended to enter into a contract. See Rabouin v. NLRB, 195 F.2d 906, 909-10 (2d Cir. 1952); Daniel Const. Co. v. Teamsters Local Union No. 991, 364 F. Supp. 731, 736-38 (S.D. Ala. 1973). On this record, given the breadth of the arbitration clauses and the presumption of arbitrability, we conclude the dispute is arbitrable, even if it may include the question of whether a contract now exists.

In opposing arbitration, AFTRA emphasizes the provision in the Letters of Adherence in which AFTRA "reserves the right to review executed Letters of Adherence . . . [and] reserves the right to reject the signatory status of any company that is not a legitimate Producer." But the Letters of Adherence also provide that the parties are bound by the terms of the Commercials Contracts, and they mention specifically the arbitration clauses. The reservation provision does not negate this agreement to arbitrate. Thus, AFTRA's claim that it reserved the unilateral right to determine Sound Check's producer status is a question for the arbitrator to resolve, at least in the first instance.

AFTRA has demonstrated it has a legitimate interest in differentiating between producers and payroll companies for collective bargaining purposes. The parties to

AFTRA collective bargaining agreements may of course agree that AFTRA should unilaterally determine whether a particular employer is a producer, and they may exempt this determination from the otherwise comprehensive arbitration clauses. The question is whether they did so in the 1997-2000 Commercials Contracts. On the skimpy record before us, we agree with the district court that the dispute is arbitrable. Therefore, the scope and effect of the reservation of rights provision in the Letters of Adherence must be initially determined by the arbitrator.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.