THE CITY OF COLLINSVILLE, Petitioner-Appellant, v. ILLINOIS STATE LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

Fifth District   No. 5—00—0403

Opinion filed April 9, 2002.

Steven C. Giacoletto, of Giacoletto & Johnston, of Collinsville, for petitioner.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Michael P. Doyle, Assistant Attorney General, of counsel), for respondent Illinois State Labor Relations Board.

Bruce S. Feldacker, of Feldacker & Durbin, P.C., of Clayton, Missouri, for respondent International Union of Operating Engineers, Local 520.

PRESIDING JUSTICE MAAG delivered the opinion of the court:

The International Union of Operating Engineers, Local 520 (Union), the charging party, filed a charge with the Illinois State Labor Relations Board, now known as the Illinois Labor Relations Board

(Board) (5 ILCS 315/5.1 (West 2000)), alleging that the City of Collinsville (City), the respondent to the charge, refused to abide by section 3.4 of the parties' collective bargaining agreement (Agreement). The Union alleged that the City's refusal to abide by section 3.4 of the Agreement was an unfair labor practice that is proscribed by the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 *et seq.* (West 1998)). An administrative law judge conducted a hearing and issued a recommended decision that the City had violated sections 10(a)(1) and 10(a)(4) of the Act (5 ILCS 315/10(a)(1), (a)(4) (West 1998)) by refusing to bargain with the Union and by unilaterally repudiating section 3.4 of the Agreement. The administrative law judge failed to address the issue raised in count II of the complaint—whether the City had violated the Act by refusing to comply with section 3.4 of the Agreement. The City filed an exception to the administrative law judge's decision. The Union filed exceptions, due to the fact that the administrative law judge failed to include a specific finding that the City had violated section 3.4 of the Agreement. Subsequent to oral argument, the Board entered an order on June 9, 2000, affirming the administrative law judge's determination that the City had violated section 10(a)(4) of the Act and further finding that the City had violated the Act by breaching section 3.4 of the Agreement. The Board also determined that the Agreement was a valid and binding contract. The City filed a timely petition for administrative review.

The relevant facts are as follows. The City is a non-home-rule municipality. In 1967, the City's voters approved a referendum adopting article 10, division 1, of the Illinois Municipal Code (Code) (Ill. Rev. Stat. 1965, ch. 24, par. 10—1—1 *et seq.* (now see 65 ILCS 5/10—1—1 *et seq.* (West 2000))). The Union and the City have had a long-term collective bargaining relationship, dating back to the early seventies. Since 1973, the Union has represented the bargaining unit of the City's public works employees in the sewer, street, and water departments. Since 1980, the parties' Agreement has included a provision that allows existing employees to transfer into vacant bargaining unit positions. This provision was included in section 3.4 of the Agreement and states as follows:

> "When a job vacancy occurs within the Bargaining Unit, that same job classification shall be posted for bid for five (5) working days. In the event a unit employee or employees sign the bid list, the job shall be awarded to the highest senior Union employee[,] provided he shall have the skill and ability to do the work, after 60 days. It is understood that only one vacancy need be filled by the bidding procedure. Any subsequent vacancies shall be filled by the Employer from the list of available candidates furnished by the

Civil Service Commission. A successful bidder shall be on probation for 60 days in the new position, during which time he may be transferred back to his former position by the Employer or voluntarily elect to return to his former position. An employee can successfully bid a vacancy twice during the term of the contract. Any time during the sixty[-]day[ ] probation period[ ] the senior Union employee turns down the job or is sent back for just cause to his old position by the Employer, the next senior Union employee on the original bid list will have the opportunity to bid for the job. Should the next senior employee not work out for any reason, the Employer may select the third Union employee from the bid list or go to the Civil Service Commission to fill the position. Should the people at the top of the bid list not accept the open position, the process starts with the first person accepting the position. Any opening created by the bidding procedure does not need to be bid."

This provision was included in the parties' Agreement that expired on April 30, 1998.

In March 1998, the parties commenced negotiations for a successor contract. After several bargaining sessions, the Union made a proposal. In July 1998, the City approved the Union's proposal. On August 24, 1998, the Collinsville city council executed ordinance number 2884 approving the Agreement between the City and the Union for the period May 1, 1998, through April 30, 2002. The ordinance stated that the City's mayor and clerk were authorized to sign the Agreement between the City and the Union. According to the City's former manager, Thomas Christie, this ordinance represented "the official culmination of the Union contract." We note parenthetically that section 3.4 of the Agreement was unchanged from section 3.4 of the parties' previous Agreement that expired on April 30, 1998. On August 26, 1998, the City forwarded three originals of the contract to the Union.

Upon receipt of the Agreement, the Union's representatives reviewed it to ensure that it was consistent with the parties' agreement. During the review, the Union made four changes to the language in the parties' Agreement. The proposed revisions were as follows:

1. In section 3.4 (job vacancies), the Union proposed replacing the word "shall" with the word "may" in the following sentence: "Any subsequent vacancies *shall* be filled by the Employer from the list of available candidates forwarded by the Civil Service Commission." (Emphasis added.)

2. In section 3.51 (assignments), the Union proposed adding the phrase "per calendar year" to the end of the provision that provides that the director has the discretion to move employees within job descriptions for either training or emergencies on a temporary basis "limited to a maximum of six months."

3. In section 7.1 (clothing allowance), the Union proposed substituting the word "director" for "employer" regarding who shall determine procedures for the clothing allowance.

4. The Union proposed deleting either section 4.4.1 (overtime) or section 4.4.5 (overtime pyramiding) in order to resolve a Union-perceived conflict between the provisions.

After making the foregoing changes, the Union representatives went to Christie's office. Since Christie was not there, they left the contract with his administrative assistant. She told them that the city council would have to approve the changes since it had already ratified the tentative contract.

On September 23, 1998, Christie wrote a letter to the Union informing it as follows: "The City *** cannot accept the additional changes to the contract that the City Council recently approved. All changes in wording were agreed with at the last negotiating session." On October 2, 1998, Christie sent another letter to the Union's business manager because he had no response from his September 23, 1998, letter. Christie's letter stated as follows:

"Hearing no response from you to my letter of 9/23/98, the City *** hereby regards *** [the Union's] suggested changes as a counter[ ]offer and rejection of the Council[-]approved[-]and[-]signed contract of 8/24/98.

We therefore withdraw our signed 8/24/98 contract and will consider your counter[ ]offer for bargaining."

The City then expressed concern about section 3.4 of the parties' Agreement being in conflict with the Code (65 ILCS 5/10—1—1 *et seq.* (West 1998)). The parties met to discuss the matter. The City stated that section 3.4 was not an appropriate subject for bargaining because the Code's civil service provisions set forth the exclusive method for filling vacant positions. The Union claimed that section 3.4 was legal, and it stated its willingness to accept the Agreement without the changes it had proposed. The Union then sent copies of the Agreement that were signed by the Union without the changes that were proposed by the Union.

The City did not sign the draft agreement. Since October 1998, it has implemented every provision of the draft agreement except section 3.4. Since October 15, 1998, three vacancies have occurred involving bargaining unit positions that the City filled by hiring individuals through the City's civil service procedure instead of allowing employees to bid on the position pursuant to section 3.4 of the Agreement.

On November 16, 1998, the Union brought an unfair labor practice charge in case number S—CA—99—056, alleging that the City was refusing to abide by section 3.4 of the parties' Agreement. Count I of the

complaint alleged that the City committed an unfair labor practice in violation of sections 10(a)(1) and 10(a)(4) of the Act by refusing to bargain in good faith over filling job vacancies within the bargaining unit. Count II alleged that the City's refusal to abide by section 3.4 of the Agreement was a repudiation of that provision and also an unfair labor practice. The City filed an answer denying that it had committed any unfair labor practices.

On August 25, 1999, an administrative law judge conducted an evidentiary hearing. The administrative law judge issued a recommended decision and order sustaining the Union's charges. Specifically, the administrative law judge found the following:

"1. The transfer procedure is not preempted by the Illinois Civil Service statute.

2. The transfer of employees to positions within the bargaining unit is a mandatory bargaining subject because it involves terms and conditions of employment.

3. The City failed to bargain in good faith with [the Union] about the parties['] established transfer procedure[,] in violation of Section[s] 10(a)(4) and [(a)](1) of the Act.

4. The City violated Section[s] 10(a)(4) and [(a)](1) of the Act when it unilaterally discontinued the established transfer procedure."

Although the administrative law judge never explicitly stated whether the parties formed a valid collective bargaining agreement, the foregoing order shows that he implicitly determined that a contract between the parties existed.

Both parties filed exceptions to the administrative law judge's recommended decision. The Board heard oral arguments on March 20, 2000. On June 9, 2000, the Board issued a written decision in favor of the Union. The Board agreed with the administrative law judge that the Code did not preempt section 3.4 of the Agreement and that the City violated section 10(a)(4) of the Act by "unilaterally discontinuing its long-established practice of allowing bargaining unit members to transfer to vacant unit positions and by refusing to bargain in good faith with [the Union] about the transfer procedure."

The Board also addressed the question whether the parties entered into a valid collective bargaining agreement. The Board determined that the parties had a "meeting of the minds." Thus, the Board held that as of August 24, 1998, the date that the city council approved the collective bargaining agreement, the parties formed an enforceable contract. The Board concluded that the City's refusal to abide by section 3.4 of the Agreement was an unfair labor practice pursuant to the Act. The Board then ordered the City to abide by and apply section 3.4

of the Agreement as ratified by the City on August 24, 1998, and to make whole any employees that were adversely affected by the City's failure to follow section 3.4 of the Agreement.

The City filed a timely petition for administrative review.

The City claims that the Board erroneously held that an agreement existed between the City and the Union. The City claims that since no agreement existed, no unfair labor practice was committed.

Initially, we must determine the proper standard of review. The City claims that the question whether a contract exists is a question of law. The City claims that a reviewing court is not bound to give deference to the conclusions of an administrative agency when reviewing questions of law and will reverse a decision based upon an erroneous interpretation or application of the law. See *Maybell v. Illinois Liquor Control Comm'n*, 246 Ill. App. 3d 14, 22, 614 N.E.2d 1370, 1376 (1993). The Union argues that the issue of whether a contract exists presents a mixed question of law and fact and is reviewable under the "clearly erroneous" standard set forth in *Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998).

■ Administrative review law governs the judicial review of Board decisions. 5 ILCS 315/11(e) (West 1998). Pursuant to administrative review law, an agency's findings of fact are held to be *prima facie* true and correct and must be upheld unless they are against the manifest weight of the evidence. 735 ILCS 5/3—110 (West 1998). Although we are not bound by the Board's legal determinations, we will defer to the Board's reasonable construction of a statute that it is charged with enforcing. *Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345, 538 N.E.2d 1146, 1149 (1989). If a case involves a mixed question of law and fact, the "clearly erroneous" standard applies. *Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302.

■ Although we were unable to find any Illinois decision that has determined which standard applies to the review of a Board finding that a collective bargaining contract was created, in *Paxton-Buckley-Loda Education Ass'n v. Illinois Educational Labor Relations Board*, 304 Ill. App. 3d 343, 350, 710 N.E.2d 538, 544 (1999), and *City of Burbank v. Illinois State Labor Relations Board*, 185 Ill. App. 3d 997, 999, 1002-04, 541 N.E.2d 1259, 1261, 1263-64 (1989), the courts applied the manifest-weight standard to labor board determinations as to the existence of other types of contracts. Additionally, in the absence of binding authority, Illinois courts often look to federal decisions construing the National Labor Relations Act (29 U.S.C. § 151 *et seq.* (1994)) for guidance in fashioning a body of law under the Act and other state labor statutes. See *Burbank*, 128 Ill. 2d at 345, 538 N.E.2d at 1149. Federal courts construing the National Labor Relations Act have held

that whether a collective bargaining agreement has been created by two parties is a question of fact for the National Labor Relations Board to determine. See *National Labor Relations Board v. Burkart Foam, Inc.*, 848 F.2d 825, 829-30 (7th Cir. 1988).

Even though we recognize that a collective bargaining agreement is "not an ordinary contract" (*John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550, 11 L. Ed. 2d 898, 905, 84 S. Ct. 909, 914 (1964)), it nonetheless is a contract, and the question whether a collective bargaining agreement has been formed should be treated as a question of fact, in the same manner as questions regarding the formation of other types of labor agreements. We see no reason to depart from the federal decisions. Hence, we must uphold the Board's decision that a contract between the City and the Union was created, unless it is against the manifest weight of the evidence.

■ In *Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union*, 835 F.2d 1164, 1168 (6th Cir. 1987), the court stated as follows:

> "A meeting of the minds of the parties must occur before a labor contract is created. [Citation.] Whether a collective bargaining agreement exists is a question of fact; technical rules of contract law are not strictly binding. [Citation.] The existence of a collective bargaining agreement does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms."

■ The record shows that in March 1998, the parties commenced negotiations for a successor contract. After several bargaining sessions, the Union made a proposal. After 10 to 15 bargaining sessions, the parties submitted their dispute to mediation. In July 1998, the City approved the Union's proposal. On August 24, 1998, the city council executed ordinance number 2884 approving the collective bargaining agreement between the City and the Union for the period May 1, 1998, through April 30, 2002. The ordinance stated that the City's mayor and clerk were authorized to sign the Agreement between the City and the Union. According to Christie, this ordinance represented "the official culmination of the Union contract." The City then drafted and forwarded three originals of the contract to the Union. During the Union representatives' review of the parties' Agreement, the Union noticed four errors in the Agreement. Ron Blumberg, a Union representative, testified that the errors were "very minor" and were merely "wording changes." In fact, Blumberg claimed that one of the clauses that the Union wanted to remove actually contradicted another portion of the Agreement. The Union noted the errors and left the revisions at Christie's office. The City sent a letter to the Union stating that it would not consider the revisions.

Christie stated in his letter to the Union, "All changes in wording were agreed with at the last negotiating session." Following the City's refusal to modify the contract, the Union withdrew its objections to the four items and signed the contract. Since that time, the City has implemented every aspect of the Agreement except for section 3.4 of the Agreement. See *Sound Check, Inc. v. American Federation of Television & Radio Artists*, 204 F.3d 801, 804 (8th Cir. 2000) (the court held that performance is evidence that a party intended to enter into a contract).

Hence, considering the City's conduct and the fact that there was a "meeting of the minds" that resulted in the "culmination" of an agreement, we cannot find that the Board's determination that a collective bargaining agreement had been formed was against the manifest weight of the evidence.

The City contends that the agreement that it forwarded to the Union was an offer and that the Union rejected this offer when it proposed changes in the agreement. We disagree.

A collective bargaining agreement was formed on August 24, 1998. The Union's attempt to change the language in the Agreement was not a rejection of the offer. It was, in fact, a belated attempt at a counteroffer. We note, however, that counteroffers made after contract formation have no effect on the contract's validity. *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 980, 684 N.E.2d 816, 821 (1997).

The City also claims that a contract was not executed, because the parties' Agreement was not reduced to a signed document, and it argues that a formally executed contract was a condition precedent to the existence of a collective bargaining agreement. We disagree.

Section 7 of the Act (5 ILCS 315/7 (West 1998)) places a duty on the parties to execute a written contract "incorporating any agreement reached *if requested by either party*." (Emphasis added.) This language appears to suggest that a valid contract can exist even if neither party insists upon a written document. In fact, as the federal courts have long held, "The existence of a collective bargaining agreement does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms." *Bobbie Brooks, Inc.*, 835 F.2d at 1168. Even the City's attorney stated as follows: "I think there is a de facto contract with regard to this agreement even though the Mayor hasn't signed it yet *** for everything except section 3.4."

Next, the City claims that if a collective bargaining agreement between the parties exists, section 3.4's transfer provision is not enforceable because it is preempted by the Code (65 ILCS 5/10—1—1 *et seq.* (West 1998)), which governs the appointment of employees to civil service positions.

■ In *City of Decatur v. American Federation of State, County & Municipal Employees, Local 268*, 122 Ill. 2d 353, 361-62, 522 N.E.2d 1219, 1222 (1988), the Illinois Supreme Court stated that the question whether a statute preempts a matter that would otherwise be a mandatory subject of bargaining is a question of statutory interpretation and, hence, is a question of law subject to *de novo* review.

■ Section 7 of the Act (5 ILCS 315/7 (West 1998)) states as follows:

> "The duty 'to bargain collectively' shall also include an obligation to negotiate over any matter with respect to wages, hours[,] and other conditions of employment, *not specifically provided for in any other law or not specifically in violation of the provisions of any law*. If any other law pertains, in part, to a matter affecting the wages, hours[,] and other conditions of employment, such other law shall not be construed as limiting the duty 'to bargain collectively' and to enter into collective bargaining agreements containing clauses which either supplement, implement, or relate to the effect of such provisions in other laws." (Emphasis added.)

■ The City claims that with regard to there being "any other law" as stated in the foregoing statute, section 10—1—3 of the Code (65 ILCS 5/10—1—3 (West 1998)) provides as follows:

> "The commissioners shall classify all the offices and places of employment in such municipality with reference to the examinations hereinafter provided for, except those offices and places excluded by Section 10—1—17. The offices and places so classified by the commission shall constitute the classified civil service of such municipality. *No appointments to any of such offices or places shall be made except under and according to the rules hereinafter mentioned*." (Emphasis added.)

The City contends that section 7 of the Act specifically provides for the filling of job vacancies by appointment pursuant to section 10—1—3 of the Code and that, therefore, "the City does not have [a] duty to bargain regarding the filling of job vacancies." We disagree.

Section 10—1—3 of the Code provides for the filling of a vacancy through the appointment of a new employee. 65 ILCS 5/10—1—3 (West 1998). We note, however, that the Code does not require the municipality to fill a position by appointing a new employee. The municipality can leave the position vacant. Nothing in the Code prohibits the filling of positions by transfer. In fact, section 10—1—19 of the Code contemplates the possibility of transfers since it requires the municipality to notify the Civil Service Commission of any transfers within the civil service. 65 ILCS 5/10—1—19 (West 1998). Hence, as the Board found, the Code does not govern procedures for existing employees to transfer into vacant positions.

If a job vacancy arises, the municipality may transfer a current employee into that vacancy. Such a transfer will create a new vacancy in the position previously held by the transferred employee. In those cases, the municipality may choose to fill the vacancy or leave it open pursuant to the Code. If the municipality chooses to fill the vacancy by hiring a new employee, the municipality must do so in accordance with the Code's appointment provisions.

Since section 3.4 of the parties' Agreement does not require the City to disregard its duties pursuant to the Code, there is no conflict between the two provisions and the Board correctly held that the parties' agreed-upon transfer provision is not preempted by statute and is enforceable.

The City also claims that the Board erred in determining that section 3.4 is a mandatory subject of bargaining, because section 3.4 does not involve "wages, hours[,] and other conditions of employment." We disagree.

■ The Board's finding that a matter bears upon "wages, hours[,] or conditions of employment" and thus is a mandatory subject of bargaining is a mixed question of law and fact reviewable under the "clearly erroneous" standard. *Belvidere*, 181 Ill. 2d at 205, 692 N.E.2d at 302. The "clearly erroneous" standard is intended to provide some deference to an administrative agency's experience and expertise. *Land & Lakes Co. v. Pollution Control Board*, 319 Ill. App. 3d 41, 48, 743 N.E.2d 188, 193 (2000).

■ Section 4 of the Act states as follows:

"To preserve the rights of employers and exclusive representatives which have established collective bargaining relationships or negotiated collective bargaining agreements prior to the effective date of this Act, employers shall be required to bargain collectively with regard to any matter concerning wages, hours[,] or conditions of employment about which they have bargained for and agreed to in a collective bargaining agreement prior to the effective date of this Act." 5 ILCS 315/4 (West 1998).

Hence, the transfer of employees into vacant bargaining unit positions is a mandatory subject of bargaining so long as it bears on "wages, hours[,] or conditions of employment."

In *Central City Education Ass'n v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496, 523, 599 N.E.2d 892, 905 (1992), the Illinois Supreme Court stated that the question whether a matter concerns "wages, hours[,] and terms and conditions of employment" is a question that the Board is uniquely qualified to answer, given its experience and understanding of labor relations.

In *Belvidere*, 181 Ill. 2d at 209, 692 N.E.2d at 304, the court stated

that a change in the conditions of employment is not limited to "an elimination of positions or alteration of wages or hours." The *Belvidere* court held that a condition of employment may also encompass the loss of potential work or promotional opportunities. Additionally, the federal courts have noted that matters affecting work assignments affect conditions of employment and are mandatory subjects of bargaining. *AMF Bowling Co. v. National Labor Relations Board*, 977 F.2d 141, 148 (4th Cir. 1992).

Section 3.4 clearly impacts workers' opportunities; hence, it concerns "conditions of employment" as that term is used in section 4 of the Act. Section 3.4 allows bargaining unit employees the opportunity to bid for vacant bargaining unit positions, giving them the chance to change jobs. With a change of jobs often comes more favorable hours or advantageous working conditions. Additionally, a change of job often gives employees opportunities to improve or alter their terms and conditions of employment. Policies directly affecting the availability of workplace opportunities fall within the scope of the bargaining process; hence, the Board's finding that section 3.4's transfer provision was a mandatory subject of bargaining was not clearly erroneous.

█ The City also claims that it could not have violated its duty to bargain with the Union over section 3.4 because the Union never made a demand for bargaining.

In *City of East St. Louis v. Illinois State Labor Relations Board*, 213 Ill. App. 3d 1031, 1035, 573 N.E.2d 302, 305 (1991), the court stated, "There is no dispute that before there can be a wrongful refusal to bargain, there must have been a request to bargain by the union." Such a request need not use any special words or formula and can be made by clear implication. *City of East St. Louis*, 213 Ill. App. 3d at 1035, 573 N.E.2d at 305 (relying on *Joy Silk Mills v. National Labor Relations Board*, 185 F.2d 732, 741 (D.C. Cir. 1950)).

As we previously stated, after the City notified the Union that it regarded section 3.4 as illegal, the Union requested a meeting with the City. At the October 14, 1998, meeting, the Union withdrew the language changes and requested that the City implement the contract that the city council ratified, with the understanding that section 3.4 would be suspended until its legality was determined. The City refused to accept any of the proposals that the Union offered. The City took the firm stand that section 3.4 was illegal and that it did not intend to abide by section 3.4. There is absolutely no evidence that the parties negotiated the issue. The City simply announced that it would no longer implement section 3.4. At this point, it would have been futile for any further demand for bargaining. The Union took the appropriate

measures at that point, which included filing an unfair labor practice charge with the Board.

For the foregoing reasons, we affirm the Board's judgment.

Affirmed.

CHAPMAN[1] and KUEHN, JJ., concur.

---

[1]Justice Charles Chapman participated in oral argument. Justice Melissa Chapman was later substituted on the panel and has read the briefs and listened to the audiotape of oral argument.